Littler Mendelson P.C.
Jean L. Schmidt
Theo E.M. Gould
900 Third Avenue
New York, New York 10022
T: (212) 497-8486
F: (646) 417-7534

Attorneys For Defendant
Deloitte & Touche LLP

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------- X ECF CASE

PAM PANZARINO,                           :
                                         :  No. 05 Civ. 8502 (BSJ)(RLE)
                    Plaintiff,           :
                                         :  **DEFENDANT'S STATEMENT**
        -against-                        :  **OF UNDISPUTED FACTS**
                                         :
DELOITTE & TOUCHE LLP,                   :
                                         :
                    Defendant.           :
--------------------------------------------------------- X

        Defendant Deloitte & Touche LLP ("Defendant" or "Deloitte")[1], by and through its

counsel of record, respectfully submits the following statement of material facts as to which there

is no genuine dispute pursuant to Rule 56.1(a) of the Local Civil Rules of the United States

District Courts for the Southern and Eastern Districts of New York.[2]

---

[1] Plaintiff was employed by Deloitte & Touche LLP. Effective May 29, 2005, the function within Deloitte & Touche
LLP where Plaintiff worked was moved to a new entity, Deloitte Financial Advisory Services LLP ("Deloitte FAS").
Both Deloitte FAS and Deloitte & Touche LLP are subsidiaries of Deloitte LLP. For purposes of this motion,
"Deloitte" shall refer to any of Deloitte LLP, Deloitte & Touche LLP, or Deloitte FAS.
[2] Pursuant to Rule 56 of the Federal Rules of Civil Procedure, the following facts are undisputed solely for purposes
of Defendant's Motion for Summary Judgment.

**Background Facts**

1.   One of the services offered by Deloitte is Forensic and Dispute Services.  (G.Zuber Tr. 10-11).[3]  Forensic and Dispute Services is made up of individual business units which specialize in particular areas of expertise.  (G.Zuber Tr. 10-11).

2.   During all relevant time periods, Forensic and Dispute Services included a Dispute Services Group and a Business Intelligence Services ("BIS") Group.  (P.Panzarino Tr. 43-44; G.Zuber Tr. 10-11).

**Business Intelligence Services Group**

3.   In May 2000, Wendy C. Schmidt was admitted as a Principal of Deloitte and was tasked with creating a BIS Group within the overall Forensic and Dispute Services practice. (W.Schmidt Tr. 44-45; W.Schmidt Aff. ¶1).

---

[3]   Record citations herein are to the supporting Affirmation of Jean L. Schmidt dated September 19, 2008 ("J.Schmidt Aff.") and its exhibits: affidavits and affirmations ("Aff."), deposition transcript excerpts ("Tr.") and exhibits ("Exs.") referred to as follows:
- "P.Panzarino Tr." refers to Plaintiff Pam Panzarino's deposition and exhibits thereto (J.Schmidt Aff. ¶2, Ex. A)
- "C.Procopis Tr." refers to Chris Procopis' deposition and exhibits thereto (J.Schmidt Aff.¶3, Ex. B)
- "W.Schmidt Tr." refers to Wendy Schmidt's deposition and exhibits thereto (J.Schmidt Aff.¶4, Ex. C)
- "H.Lange Tr." refers to Holly Lange's deposition and exhibits thereto (J.Schmidt Aff.¶ 5, Ex. D)
- "L.Dane Tr." refers to Lisa Dane-Corcoran's deposition and exhibits thereto (J.Schmidt Aff.¶6, Ex. E)
- "L.Allen Tr." refers to Laura Allen's deposition and exhibits thereto (J.Schmidt Aff.¶7, Ex. F)
- "G.Yarnall Tr." refers to Gerry Yarnall's deposition and exhibits thereto (J.Schmidt Aff.¶8, Ex. G)
- "G.Zuber Tr." refers to George Zuber's deposition and exhibits thereto (J.Schmidt Aff.¶9, Ex. H)
- "L.Justice Tr." refers to Linda Justice's deposition and exhibits thereto (J.Schmidt Aff.10, Ex. I)
- "J.Raskin Tr." refers to Jessica Raskin's deposition and exhibits thereto (J.Schmidt Aff.¶11, Ex. J)
- "N.Ginsburg Tr." refers to Nancy Ginsburg's deposition and exhibits thereto (J.Schmidt Aff.¶12, Ex. K)
- "J.Rujikarn Tr." refers to Jeannie Rujikarn's deposition and exhibits thereto (J.Schmidt Aff.¶13, Ex. L)
- "M.Long Tr." refers to Magda Long's deposition and exhibits thereto (J.Schmidt Aff.¶14, Ex. M)
- "A.Barton Aff." refers to Anne Barton's affidavit and exhibits thereto (J.Schmidt Aff.¶15, Ex. N)
- "W.Schmidt Aff." refers to Wendy Schmidt's affidavit and exhibits thereto (J.Schmidt Aff.¶16, Ex. O)
- "H.Lange Aff." refers to Holly Lange's affidavit and exhibits thereto (J.Schmidt Aff.¶17, Ex. P)

4.   The BIS Group specializes in performing complex fraud investigations, litigation support, due diligence and background investigations for clients by gathering information and intelligence on people and entities from a variety of sources.  (W. Schmidt Tr. 46).  When the BIS Group performs these services for an external client for a fee, the work is called "Client Service" work.  (P.Panzarino Tr. 48-51; W. Schmidt 46).

5.   Prior to joining Deloitte, from 1996 until 2000, Ms. Schmidt was a Managing Director at Pricewaterhouse Coopers LLP ("PWC") in its Financial Advisory Services department. (W.Schmidt Tr. 24).   While at PWC, Ms. Schmidt hired Lisa Dane and Holly Lange, among others, to conduct due diligence research for external clients, write reports on the results and otherwise help Ms. Schmidt develop her business.  (W.Schmidt Tr. 26-27; H.Lange Tr. 15-17; L.Dane Tr. 30).   Both Ms. Dane and Ms. Lange had experience in conducting background investigations prior to joining PWC.  (W.Schmidt Tr. 31; H.Lange 16-17; L.Dane Tr. 30-31).

6.   Ms. Schmidt viewed her working relationship with Ms. Dane and Ms. Lange at PWC as strong and depended on them in her business.  (W.Schmidt Tr. 30-32).  Ms. Schmidt relied upon and trusted their opinions.  (W.Schmidt Tr. 30-32).

7.   Ms. Dane and Ms. Lange left PWC in May 2000 and May 2001 respectively, and were hired by Deloitte to assist Ms. Schmidt to develop the BIS Group and to perform Client Service work.  (W.Schmidt Tr. 42, 45-47).  Lisa Dane was hired as a Manager and Holly Lange was hired as a Senior Associate.  (W.Schmidt Tr. 42; L.Dane Tr. 33-34; H.Lange Tr. 16).[4]

8.   From May 2000 through September 2001, Ms. Schmidt hired five other individuals, three women and two men, to work in the BIS Group.  (P.Panzarino Tr. 49-53; W.Schmidt Tr. 45; C.Procopis Tr. 16-17, 21-24)  The individuals that were hired were Cathy LeBlanc (Senior

Associate), Jessica Raskin (Senior Associate), Jeannie Rujikarn (Senior Associate) and Christopher Procopis (Senior Associate). (P.Panzarino Tr. 49-53; J.Rujikarn Tr. 10; J.Raskin Tr. 10; C.Procopis Tr. 12, 22-23; W.Schmidt Tr. 45-46).[5]  Mr. Procopis, Ms. Rujikarn, Ms. Raskin and Ms. LeBlanc all had experience performing Client Service work prior to joining the BIS Group. (P.Panzarino Tr. 49-53; W.Schmidt Tr. 45; Procopis 12, 22-23; J.Rujikarn Tr. 9-11; J.Raskin Tr. 9-11).

9.  Ms. Schmidt and Ms. Lange created a new service product within the BIS Group which was designed to be offered internally at Deloitte. (W.Schmidt. Tr. 47-49).  This service product was an abbreviated due diligence background search on potential clients of Deloitte which would be conducted prior to Deloitte accepting a particular entity as a client. (W.Schmidt. Tr. 48).  This was called "Client Acceptance" work.  (P.Panzarino Tr. 46).  In contrast to traditional Client Service work, Client Acceptance work required BIS employees to conduct due diligence background searches on people and entities within a limited timeframe and budget. (W.Schmidt Tr. 48-49, 149-50).[6]

10. As opposed to Client Service work which varied depending upon the nature and scope of the engagement, Client Acceptance work adhered to a uniform methodology, reporting template and research parameters, all of which Ms. Lange developed to be performed within a limited timeframe and budget. (W.Schmidt Tr. 48-50, 149-50).

11. For both Client Service and Client Acceptance work, employees of the BIS Group are required to utilize internet research on the computer and review manual sources for background

---

[4] Ms. Schmidt promoted Ms. Dane to Senior Manager (August 24, 2003), and Ms. Lange to Manager (August 26, 2001) and later Senior Manager (August 21, 2005). (W.Schmidt. Aff. ¶¶12-13).

[5] The fifth individual transferred out of the BIS Group soon after joining in 2000. (C.Procopis Tr. 12, 22-23).

information.    (W.Schmidt Tr. 28-29).    The BIS Group uses vendors such as Lexis Nexis, Westlaw, and Kroll Background America ("Kroll") as sources of background information for their Client Acceptance and Client Service work.  (P.Panzarino Tr. 64).

12. Ms. Lange was given primary managerial responsibility for Client Acceptance work in the BIS Group.  (W.Schmidt Tr. 48-50, 149-50; H.Lange Tr. 18).

13. Ms. Lange worked with Deloitte's risk management team to launch the Client Acceptance product, and coordinated its implementation nationwide.  (W.Schmidt Tr. 48-49, 149-150).

14. Ms. Lange trained the other members of the BIS Group on how to perform Client Acceptance work and supervised their performance on that work.  (W.Schmidt Tr. 48-49, 149-150).

15. Ms. Lange maintained a master list of Client Acceptance cases, which logged and tracked who worked on which cases, the subjects of each case, when the cases came in, when the cases were sent out in draft form, and when the cases were sent out in final form.  (W.Schmidt Tr. 48-49, 149-150).

16. Ms. Lange also reviewed drafts of the Client Acceptance reports after they were prepared by the employees of the BIS Group in order to maintain quality control and consistency. (W.Schmidt Tr. 48-49, 149-150; P.Panzarino Tr. 113).

17. Ms. Schmidt always considered Ms. Lange to be the primary person responsible for managing Client Acceptance work because Ms. Lange had created the Client Acceptance product

---

[6] The Client Acceptance process was designed to ensure that Deloitte was aware if either the potential client, or the lead principals of the potential client, had any negative history prior to accepting them as a client of Deloitte. (P.Panzarino Tr. 46; W.Schmidt. Tr. 47-48).

and had the greatest level of understanding regarding its day-to-day operation.  (W.Schmidt Tr. 31-32, 173-74).

**Plaintiff Pam Panzarino is Hired By Deloitte**

18. In or about March 1997, Plaintiff Pam Panzarino ("Plaintiff" or "Panzarino") was hired by Deloitte as a Senior Consultant (also referred to as a "Senior" or "Senior Associate") in the Dispute Services Group to work on litigation support engagements. (P.Panzarino Tr. 18-19).

19. Plaintiff signed an offer letter dated March 11, 1997, which set forth the terms and conditions of her employment at Deloitte and stated that her employment with Deloitte would be "at-will." (P.Panzarino Tr. 26-27, Ex. 1, 4).

20. Plaintiff also was given, signed and acknowledged, Deloitte's anti-harassment policy at the start of her employment at Deloitte.  (P.Panzarino Tr. 31-32, Ex. 2).  The anti-harassment policy states:

> "The firm is committed to providing a work environment that is free from harassment of a sexual, racial, ethnic, or religious nature. Expressly forbidden are unwelcome sexual advances, requests for sexual favors, and any other verbal or physical conduct of a sexual nature.  Depending on the circumstances, such harassment may also include conduct such as stereotyped or demeaning remarks or gestures or the display or circulation, whether in writing or electronically, or materials or pictures offensive to either gender or to racial, ethnic, or religious groups. Submission to or rejection of such conduct will in no way be considered a term of (sic) condition of employment, nor will it be used as a basis for personnel decisions."

(P.Panzarino Tr. 31-32, Ex. 2).

21. Deloitte's anti-harassment policy also contains a process for reporting complaints of harassment and "…prohibits retaliation against employees who in good faith have filed complaints of harassment, even if insufficient evidence is found to support the complaint." (P.Panzarino Tr. 31-32, Ex. 2).

22. Plaintiff was promoted from Senior Consultant to Manager in the Dispute Services Group in or about September 2000. (P.Panzarino Tr. 35, Ex. 4).

**Plaintiff Joins the BIS Group**

23. In or about November 2001, Plaintiff requested a transfer from the Dispute Services Group into the BIS Group. (P.Panzarino Tr. 44-46). Ms. Schmidt approved Plaintiff's request to join the BIS Group. (W.Schmidt Tr. 51).

24. Plaintiff retained the title of Manager that she had received prior to joining the BIS Group. (W.Schmidt Tr. 53-54; P.Panzarino Tr. 50-51).

**Plaintiff's Duties in the BIS Group**

25. Ms. Lange trained Plaintiff on how to conduct and manage Client Acceptance work. (H.Lange Tr. 21-22; P.Panzarino Tr. 91, 657).

26. Plaintiff had no previous experience in performing or managing Client Acceptance or Client Service work. (W.Schmidt Tr. 53-54; P.Panzarino Tr. 50-51).

27. Part of Plaintiff's duties included conducting Client Acceptance research and drafting reports based on the results. (P.Panzarino Tr. 64, 116-21).

28. Plaintiff also supervised an administrative assistant named Joanne Sargent, and later supervised Norma Moravec, who replaced Ms. Sargent. (P.Panzarino Tr. 82-83, 649; W.Schmidt Tr. 53-54, 109-10, 112-13; H.Lange Tr. 34).

29. From approximately December 2001 or January 2002 onwards, Ms. Schmidt and Ms. Lange understood that Plaintiff's managerial responsibilities included managing the payment of all of the vendor invoices with respect to charges that were incurred by the BIS Group. (P.Panzarino Tr. Ex. 4; H.Lange 33-34; W.Schmidt Tr. 53-54, 110). This included supervising

Ms. Sargent's processing and payment of the vendor invoices and making sure that the charges were accurate. (P.Panzarino Tr. Ex. 4; H.Lange 33-34; W.Schmidt Tr. 53-54, 110).

30. In April or May of 2002, Ms. Lange moved from New York City to Chicago. (P.Panzarino Tr. 59; H.Lange Tr. 41). As Client Acceptance continued to grow into a nationwide service product within Deloitte, three Managers in the BIS Group -- Ms. Lange, Plaintiff and Ms. LeBlanc -- divided the responsibility for assigning Client Acceptance cases based on geographic region. (P.Panzarino Tr. 79-80; H.Lange Tr. 40-41).

31. Plaintiff was located in New York, Ms. Lange was located in Chicago and Ms. LeBlanc was located in Boston. (P.Panzarino Tr. 59, 71, 76).

32. A central email account was established where most Client Acceptance requests would be sent. (P.Panzarino Tr. 71-72, Ex. 6). Ms. Lange, Plaintiff, and Ms. LeBlanc would access the central email account and assign the cases that originated from their designated geographic region to the BIS employees to do the research and prepare the reports. (P.Panzarino Tr. 71-72, 75, Ex. 6). They also assigned cases to themselves. (P.Panzarino Tr. 64, 116-21).

**Kroll Billing Error and Plaintiff's Complaint to Gerry Yarnall in February of 2003**

33. In or about January of 2003, Ms. Schmidt discovered that during the previous six-month period, Kroll had over-billed the BIS Group by tens of thousands of dollars. (P.Panzarino Tr. 435; W.Schmidt Tr. 107).

34. Ms. Schmidt held Plaintiff and Ms. Sargent responsible for failing to uncover the over-billing error. (P.Panzarino Tr. 434, 468, 471-72, 674, Ex. 49; W.Schmidt Tr. 106).

35. Ms. Schmidt had reminded Plaintiff on numerous occasions to be diligent in her supervision of Ms. Sargent, and to make sure to monitor the vendor invoices. (P.Panzarino Tr. Ex. 43, 44, 45, 47, 49).

36. Prior to the discovery of Kroll's over-billing error, Plaintiff had not been reviewing the invoices or supervising Ms. Sargent with respect to paying the vendor invoices. (P.Panzarino Tr. 439, 451, 472, 649-50).

37. Ms. Schmidt was particularly disappointed with Plaintiff and Ms. Sargent's job performance because Ms. Schmidt recognized the over-billing error after a review of the invoices which took her "about three minutes." (W.Schmidt Tr. 107).

38. On January 28, 2003, Ms. Sargent notified Ms. Schmidt that she was resigning her employment at Deloitte effective January 29, 2003. (W.Schmidt Aff. ¶18, Ex. A).

39. The next day, January 29, 2003, Plaintiff contacted Gerry Yarnall, a Partner at Deloitte, because she was concerned about the fact that she was being blamed for failing to notice the Kroll over-billing error. (P.Panzarino 341-42, 474-75, 477, Ex. 35; G.Yarnall Tr. 40). Plaintiff had a meeting with Mr. Yarnall that day in his office at Deloitte and they discussed the Kroll over-billing situation. (P.Panzarino Tr. 478). Plaintiff did not discuss any other issues or allegations with Mr. Yarnall at that meeting. (P.Panzarino Tr. 480).

40. On February 3, 2003, Plaintiff asked to meet with Mr. Yarnall a second time. (P.Panzarino Tr. Ex. 35). This meeting took place on February 6, 2003 at Grand Central Station in New York City. (P.Panzarino Tr. 488, 505).

41. Plaintiff again discussed with Mr. Yarnall the Kroll over-billing situation. (P.Panzarino Tr. 495).

42. At the meeting on January 6, 2003, Plaintiff also raised a variety of issues with Mr. Yarnall regarding Ms. Schmidt's behavior and management of the BIS Group, such as: that Ms. Schmidt did not have a private investigators license; that Ms. Dane received favorable treatment; that Ms. Schmidt had cursed at a vendor; that a Client Acceptance template seemed to indicate

that it was created at PWC; and that Plaintiff thought Ms. Schmidt's BIS Group lacked "controls and procedures." (P.Panzarino Tr. 123-24, 497-515, Ex. 51).

43. Plaintiff did not complain to Mr. Yarnall that any of Ms. Schmidt's conduct was motivated by the gender of the individuals involved.   (P.Panzarino Tr. 497-515, Ex. 51). Plaintiff did not complain to Mr. Yarnall that she thought that she was being discriminated against because of her gender or any other protected classification.  (P.Panzarino Tr. 497-515, Ex. 51).  Plaintiff did not complain that she thought that Ms. Schmidt's conduct violated the discrimination laws.  (P.Panzarino Tr. 497-515, Ex. 51).

44. Plaintiff prepared two documents for the February 6, 2003 meeting with Mr. Yarnall. (P.Panzarino Tr. 492-93, Ex. 51).   One was an outline of what Plaintiff believed were her responsibilities in the BIS Group.  (P.Panzarino Tr. 492-95, Ex. 51).  The second document contained a series of bullet points relating to instances where Plaintiff believed that Ms. Schmidt's conduct had been, or may have been, inappropriate. (P.Panzarino Tr. 493-95, Ex. 51).

45. After the meeting on February 6, 2003, Plaintiff shared a cab back to Deloitte with Mr. Yarnall.  (P. Panzarino Tr. 515).  Plaintiff gave Mr. Yarnall copies of both of the documents that she had created for the meeting.  (P. Panzarino Tr. 516).  Plaintiff had meant to give Mr. Yarnall only a copy of the document outlining her responsibilities in the BIS Group.  (P.Panzarino Tr. 516-17).  When Plaintiff realized that she had given Mr. Yarnall a copy of the bullet point document by mistake, she told him to "just disregard" it. (P.Panzarino Tr. 521).

46. Later that day, George Zuber called Plaintiff into his office to discuss the contents of her bullet point document.  (P.Panzarino Tr. 524-26; G.Zuber Tr. 63).   At the time, Mr. Zuber was the Managing Partner of the Forensic and Dispute Consulting Services practice at Deloitte. (P.Panzarino Tr. 524; G.Zuber Tr. 58-59, 62-63).   Mr. Yarnall had given the bullet point

document to Mr. Zuber in order to get Mr. Zuber's guidance on how to handle the situation. (G.Zuber Tr. 63; G.Yarnall Tr. 66-67).

47. Plaintiff told Mr. Zuber that Mr. Yarnall should not have shown the bullet point document to him because it was "off the record and confidential." (P.Panzarino Tr. 529). Plaintiff said to Mr. Zuber that "...I told Gerry to disregard this." (P.Panzarino Tr. 526). Based on Plaintiff's request, Mr. Zuber discarded the bullet point document and did not look into the substance of Plaintiff's allegations. (P.Panzarino Tr. 527; G.Zuber Tr. 63-64).

48. The next day, February 7, 2003, Plaintiff sent an email to Ms. Schmidt and Nancy Ginsburg regarding the events of February 6, 2003. (P. Panzarino Tr. Ex. 37). Ms. Ginsburg was a Manager in Deloitte's Human Resources department with responsibility for the BIS Group in New York. (N.Ginsburg Tr. 32-33, 37-38).

49. In the email to Ms. Schmidt and Ms. Ginsburg, Plaintiff stated that the bullet point document was just a "clarification of thoughts that addressed prior frustration." (P. Panzarino Tr. Ex. 37). Plaintiff wrote that she "had written this draft while in a state of frustration and shock over Joanne's abrupt resignation and the other unfortunate surrounding events." (P. Panzarino Tr. Ex. 37). Plaintiff wrote that she had told Mr. Yarnall to "disregard" the concerns set forth in the bullet point documents and that "everything mentioned was a non issue." (P. Panzarino Tr. Ex. 37).

50. Plaintiff wrote in her email that the only purpose of her speaking with Mr. Yarnall was "… to seek advice on how to make you [Ms. Schmidt] appreciate me more as a BIS manager and further the goals of the group." (P. Panzarino Tr. Ex. 37).

**March 2004**

51. Approximately thirteen months later, in or about early March 2004, Ms. Schmidt began a review of the productivity and work habits of all of the members of the BIS Group. (W.Schmidt Tr. 280).

52. Ms. Lange and Ms. Schmidt had discussed the fact that some of the BIS employees took longer than others to complete Client Acceptance cases and that some accepted more Client Acceptance cases than others.  (W.Schmidt Tr. 141, 280-81; H.Lange Tr. 190, Ex. AV).  Ms. Lange told Ms. Schmidt that there appeared to be a significant variance in how certain BIS employees worked on Client Acceptance cases.  (W.Schmidt Tr. 141, 280-81; H.Lange Tr. 190, Ex. AV).  Ms. Schmidt asked Ms. Lange to prepare an analysis of recent Client Acceptance cases in order to assess how each employee was performing.  (W.Schmidt Tr. 141, 280-81; H.Lange Tr. 190, Ex. AV).

53. On March 9, 2004, Ms. Lange emailed Ms. Schmidt a spreadsheet which showed the amount of days that the employees in the BIS Group had taken, on average, to complete Client Acceptance cases. (P.Panzarino Tr. Ex. 33).

54. After receiving Ms. Lange's results, Ms. Schmidt emailed the BIS Group to notify them that she was concerned that a significant discrepancy existed within the BIS Group with respect to the amount of time it took certain employees to complete Client Acceptance cases, and that some employees were not "pulling their weight" commensurate with their level. (P.Panzarino Tr. Ex. 15).  Ms. Schmidt then scheduled meetings with the employees of the BIS Group to discuss the specifics of their performance.  (P.Panzarino Tr. 397; W.Schmidt Tr. 267).

55. On March 11, 2004, Ms. Schmidt met with Plaintiff to discuss her performance. (P.Panzarino Tr. 394-95; W.Schmidt Tr. 152-53).

56. Ms. Schmidt and Plaintiff discussed what Plaintiff's responsibilities were with respect to managing Client Acceptance work. (P.Panzarino Tr. 394-95). Ms. Schmidt asked Plaintiff to track her administrative time more specifically so that she could determine what administrative tasks Plaintiff was working on and how much time Plaintiff was spending on each one. (P.Panzarino Tr. 174, 395, 404-05, 801-802). Ms. Schmidt did not reassign or take any duties away from Plaintiff during that meeting. (P.Panzarino Tr. 806).

57. By the end of her meeting with Ms. Schmidt, Plaintiff felt "positive" that everything was okay and thought that the meeting "ended more like a pat on your back." (P.Panzarino Tr. 610).

58. During the week of March 15, 2004, Ms. Schmidt received a voicemail on her Deloitte phone containing a high priority Client Acceptance request arising out of the New York area relating to Al Sharpton. (W.Schmidt Tr. 462). Ms. Schmidt forwarded the voicemail containing the request to Ms. Lange to supervise and assign. (W.Schmidt Tr. 462; H.Lange Tr. 187).

**<u>Plaintiff's Termination of Employment (Cplt. ¶¶18-20)</u>**

59. On Sunday, March 21, 2004, Ms. Schmidt sent an email to the entire BIS Group to inform them that BIS was particularly busy and that everyone was going to have to contribute more than usual in order to get all of the work done. (W.Schmidt Aff. ¶19, Ex. B).

60. The next day, Monday, March 22, 2004, the BIS Group conducted a short training session with a Lexis Nexis representative at Deloitte's New York office. (P.Panzarino Tr. 216-17; W.Schmidt Tr. 104; G.Yarnall Tr. Ex. G). Plaintiff and Ms. Schmidt both attended this training session. (P.Panzarino Tr. 217). Ms. Lange participated via telephone from Chicago. (P.Panzarino Tr. 217).

61. During the training session, Ms. Schmidt referred certain Client Acceptance questions to Ms. Lange. (P.Panzarino Tr. 215-16). Plaintiff felt slighted because Ms. Schmidt did not direct the questions to her. (P.Panzarino Tr. 215-18).

62. After the training session, Ms. Schmidt asked Plaintiff to do a simple media search for a Client Acceptance case, which would have taken about thirty minutes to complete. (P.Panzarino Tr. 203-04, Ex. 18; W.Schmidt Tr. 344-45).

63. Plaintiff told Ms. Schmidt that she could not work on the assignment because she was working on four "rush" cases, that she had worked all day on Sunday (the day before), and that she did not have time to conduct the search. (P.Panzarino Tr. 204, Ex. 18; W.Schmidt Tr. 107, 343-49; H.Lange Tr. 209; L.Justice Tr. 192-93).[7]

64. Later that day, Yonina Fishoff, a new Associate in the BIS Group, came to Ms. Schmidt's office and told her that after Ms. Schmidt had spoken to Plaintiff about the media search and left the room, Plaintiff called Ms. Schmidt a "bitch" in front of everyone who was left. (W.Schmidt Tr. 346-48).

65. Ms. Schmidt consulted Ms. Dane and Ms. Lange in order to determine whether or not Plaintiff's excuse for refusing to do the media search that Ms. Schmidt had requested was valid. (W.Schmidt Tr. 353, 372; H.Lange Tr. 208-09; L.Dane Tr. 93-94).

66. Ms. Schmidt was particularly concerned because Plaintiff, a Manager, had refused her request in front of junior Associates. (W.Schmidt Tr. 268-69, 345-46). Plaintiff's refusal also came one day after Ms. Schmidt had specifically asked the entire BIS Group for extra support. (H.Lange Tr. 219-20; W.Schmidt Aff. ¶19, Ex. B).

---

[7] "Rush" case designates a Client Acceptance request that needs to be completed on a priority basis. (W.Schmidt. Aff. ¶14).

67. Ms. Lange, who kept the master list showing which Client Acceptance cases each BIS employee was working on, told Ms. Schmidt that the cases which were assigned to Plaintiff did not appear to be of the type which would have precluded Plaintiff from accepting Ms. Schmidt's assignment. (W.Schmidt Tr. 354; L.Dane Tr. 93-94).

68. The next morning, on March 23, 2004, Ms. Schmidt sent Plaintiff an email expressing her dissatisfaction with Plaintiff's refusal to do the media search. (P.Panzarino Tr. Ex. 18).

69. Ms. Schmidt wrote to Plaintiff:

> "I think it is important that I express to you my disappointment in your refusal to do the media search that I requested yesterday. Quite frankly, I was so taken aback at the time that I did not know how to respond, especially because other staff members were present. You mentioned to me that you had 4 client acceptance cases on your plate and that you were too busy to take this on. Even if you had gotten them all that day (and I don't know the status of each), I don't think that asking you to pitch in by doing a simple search is asking too much. Other people have much more on their plate than 4 client acceptance cases, and I felt your refusal, particularly in front of new staff members, did not set a good example. Perhaps there were other extenuating circumstances that I am not aware of, but in the interest of open communication and trust, I wanted to give you feedback here."

(P.Panzarino Tr. Ex. 18).

70. Plaintiff again responded that she "…worked all day Sunday on a priority client acceptance (common names) and I had another one I had to get out for Monday, in addition to two other cases." (P.Panzarino Tr. Ex. 18).[8]

71. Plaintiff then questioned the reason why Ms. Schmidt had forwarded the Al Sharpton Client Acceptance request to Ms. Lange. (P.Panzarino Tr. Ex. 18). Ms. Schmidt explained to Plaintiff "[o]n the Al Sharpton thing, I always forward everything client acceptance to Holly, and let her figure it out. I did not even take the time to think about where it was coming from – it's

easier for me to send all these requests to Holly. If you would rather I funnel every inquiry to you, I can do that just let me know." (P.Panzarino Tr. Ex. 18).

72. Plaintiff did not accept Ms. Schmidt's offer to accept responsibility for everything related to Client Acceptance. (P.Panzarino Tr. 223).

73. Ms. Lange sent Ms. Schmidt an email which detailed her analysis of Plaintiff's excuse for refusing to accept Ms. Schmidt's assignment on March 22, 2004, and informed Ms. Schmidt that she thought Plaintiff had lied about her workload and the amount of time it had taken her to complete each case. (W.Schmidt Tr. 354, 372-73, 377; W.Schmidt Aff. ¶20, Ex. C).

74. The master list showed that Plaintiff was not actually working on four "rush" cases as she had claimed. (W.Schmidt Aff. ¶20, Ex. C). As of March 22, 2004, Plaintiff had three cases, not four, assigned to her; two "full" (case nos. 1137 & 1138) and one "partial" (case no. 1144).[9] (W.Schmidt Aff. ¶20, Ex. C).[10]

75. During the week ending Saturday, March 20, 2004, Plaintiff had billed seven hours each to case nos. 1137 and 1138. (P.Panzarino Tr. Ex. 5). Plaintiff worked very little, if at all, on these cases after March 20, 2004, and did not charge any additional time to these cases after that date. (P.Panzarino Tr. 247-48, Ex. 11).

---

[8] "Common names" refers to a background investigation where the name(s) of the subject of the investigation are "common," and thus the research generally takes longer to complete because the search results can be voluminous and require more time to analyze. (W.Schmidt Aff. ¶15).

[9] In 2004, a "full" Client Acceptance case was one that required doing research on a business entity and individual executives. (W.Schmidt Aff. ¶16). With respect to the executives, this research was typically comprised of online searches for federal civil, criminal, and bankruptcy records, liens and judgments, adverse media, regulatory actions, and manual searches for county-level criminal records, and federal civil/criminal records. (W.Schmidt Aff. ¶16). In contrast, in 2004, typically, a "partial" Client Acceptance case was one that only required doing research on directors of the business entity. (W.Schmidt Aff. ¶17). This research was typically comprised of just an online regulatory search, thereby requiring less work from the researcher. (W.Schmidt Aff. ¶17).

[10] The Client Acceptance cases that Ms. Lange identified that Plaintiff had assigned to her as of March 22, 2004 were case nos. 1137 (full), 1138 (full) and 1144 (partial). (W.Schmidt Aff. ¶20, Ex. C). Only one of these three was marked "rush." (W.Schmidt Aff. ¶20, Ex. C).

76. Thus, Plaintiff only had one active case (no. 1144) on March 22, 2004, not four, as she had indicated to Ms. Schmidt. (P.Panzarino Tr. 247-48, Ex. 5, 11; W.Schmidt Aff. ¶20, Ex. C). Further, case no. 1144 was a "partial" case that Ms. Lange did not think had any "common" names. (P.Panzarino Tr. 247-48, Ex. 5, 11; W.Schmidt Aff. ¶20, Ex. C).

77. In addition to explaining to Ms. Schmidt why Plaintiff had misrepresented her workload on March 22, 2004, Ms. Lange also questioned the amount of time that Plaintiff had spent on and billed to the above cases. ((W.Schmidt Aff. ¶20, Ex. C; J.Schmidt Aff. ¶21, Ex. T). Ms. Lange stated that she could not "imagine what [Plaintiff] had to work on 'all day' on Sunday." (W.Schmidt Aff. ¶20, Ex. C).[11]

78. Despite Plaintiff's assertion on two different occasions that she had "worked all day Sunday," Plaintiff had in fact not billed any time on Sunday, March 21, 2004. (P.Panzarino Tr. 153, 160, 236, 241-42, Ex. 11; H.Lange Tr. 217). Plaintiff now admits that when she told Ms. Schmidt that she had worked "all day Sunday" she did not mean that she had worked all day Sunday. (P.Panzarino Tr. 241-42).

79. When Ms. Schmidt learned that Plaintiff had misrepresented both her workload and the number of hours that she had worked, Ms. Schmidt became concerned about the accuracy of Plaintiff's research and the amount of time it took her to complete Client Acceptance cases. (W.Schmidt Tr. 372-73; H.Lange Tr. 225-26).

80. Ms. Schmidt asked Ms. Lange to check some recent cases that Plaintiff had worked on to see, among other things, whether Plaintiff had accurately reported her time. (W.Schmidt Tr. 372-73; H.Lange Tr. 225-26).

---

[11] Ms. Lange expressed the same sentiments to Ms. Dane. (H. Lange Af.. ¶2, Ex. A).

81. Ms. Schmidt also asked Ms. Lange to have a junior associate research a couple of Client Acceptance cases that Plaintiff had been assigned to see if the time that Plaintiff had charged to them was reasonable.  (W.Schmidt Tr. 372-73; H.Lange Tr. 225-26).  Ms. Schmidt thought that she could objectively analyze the amount of time it took to complete these Client Acceptance cases by having a junior associate replicate the work that Plaintiff had performed. (W.Schmidt Tr. 383-84; H.Lange Tr. 225-26).

82. Ms. Schmidt and Ms. Lange decided to use Magda Long, a junior Associate in the BIS Group who was located in the Chicago office, to perform this task.  (W.Schmidt Tr. 384-85; H.Lange Tr. 245-47).

83. On or about March 31, 2004, Ms. Lange asked Ms. Long to replicate (or "shadow") two of Plaintiff's cases.  (M.Long Tr. 81).  Ms. Lange instructed Ms. Long to proceed as if she had been assigned these two Client Acceptance cases in the usual course of business and to perform the Client Acceptance work from start to finish, completing each step of the process as she usually would, including drafting a Client Acceptance report of the results.  (M.Long Tr. 81, Ex. CA-1).  Ms. Lange asked Ms. Long to track how long it took her to complete each Client Acceptance report.  (M.Long Tr. 81, Ex. CA-1).  Ms. Lange did not tell Ms. Long why she wanted Ms. Long to replicate the two cases.  (M.Long Tr. 84-85).

84. Ms. Long replicated Client Acceptance case nos. 1137 and 1138, both of which Plaintiff had worked on during the week ending March 20, 2004.  (M.Long Tr. 84-85, CA-1, CB-1; P.Panzarino Ex. 5).

85. Ms. Long completed case no. 1137 from start to finish in one hour.  (M.Long Tr. 84-85, Ex. CA-1, CA-2, CA-3).

86. Ms. Long completed case no. 1138 from start to finish in two hours. (M.Long Tr. 84-85, Ex. CB-1, CB-2).

87. Ms. Long also was able to identify results that Plaintiff had inaccurately reported in case no. 1138. (M.Long Tr. 84-85; G.Yarnall Tr. Ex. G).

88. Ms. Lange's independent investigation yielded similar results, including discovering that Plaintiff had completed Client Acceptance case no. 1158 in one hour and forty-five minutes, yet billed six hours to the case. (W.Schmidt Tr. 170-73, 409-11; H.Lange Aff. ¶3, Ex. B; W.Schmidt Aff. ¶23, Ex. F; P.Panzarino Tr. Ex. 11).

89. On or about March 25, 2004, Ms. Schmidt contacted Ms. Ginsburg in Deloitte's Human Resources department regarding Plaintiff's conduct and the potential for her termination from the BIS Group. (W.Schmidt Tr. 272-73).

90. At the same time, also on March 25, 2004, Ms. Schmidt started drafting a memorandum regarding Plaintiff's conduct. (W.Schmidt Tr. 320-21).

91. At Ms. Schmidt's request, Ms. Lange collected all of the technical information relating to which cases Plaintiff had worked on, when, how many hours she charged, the results of the shadow researching, the over-billing, and a timeline of Plaintiff's conduct during the week of March 22, 2004. (H.Lange Tr. 247-48).

92. Plaintiff was scheduled to go on vacation the week of March 29, 2004. (P.Panzarino Tr. 373-74, 770). Ms. Schmidt attempted to ascertain from Plaintiff, on at least three occasions, who was going to cover her cases while she was away. (P.Panzarino Tr. Ex. 31, 32; W.Schmidt Aff. ¶ 22, Ex. E). Plaintiff did not respond to Ms. Schmidt's requests. (W.Schmidt Aff. ¶¶21, 24, Ex. D, G).

93. On April 1, 2004, Ms. Lange emailed a draft summary of the information that she had collected to Ms. Dane for review and editing. (H.Lange Tr. Ex. BE; W.Schmidt Aff ¶ 25, Ex. H). Ms. Lange copied Ms. Schmidt on the email. (H.Lange Tr. Ex. BE). Ms. Lange mailed the hard copies of the backup information to Ms. Dane in New York for her review. (L.Dane Tr. Ex. BN; H.Lange Aff. ¶4, Ex. C).

94. Ms. Schmidt confirmed with Ms. Lange and Ms. Dane that she would be incorporating their information into a memorandum that she was going to present to "legal and HR." (W.Schmidt Tr. Ex. CM).

95. On or about April 1, 2004, Ms. Schmidt contacted George Harmon, a Manager-level Employee Relations representative in Deloitte's Human Resources Department, to discuss Plaintiff's conduct. (W.Schmidt Tr. 317; W.Schmidt Aff ¶26, Ex. I). Ms. Schmidt told Mr. Harmon that it was her intention to terminate Plaintiff's employment based on the results of her investigation. (W.Schmidt Tr. 317-18). Ms Schmidt informed Mr. Harmon that she was documenting the basis for her decision and would forward it to him. (J.Schmidt Aff. 18, Ex. Q).

96. Ms. Dane reviewed and edited Ms. Lange's findings and put the information that Ms. Lange had compiled into a bullet point summary. (L.Dane Tr. 106-08; H.Lange Aff. ¶5, Ex. D). Ms. Dane also included some additional information relating to other conduct by Plaintiff that Ms. Dane had discovered which she considered to be inappropriate. (L.Dane Tr. 106-08). Ms. Dane transmitted this document to Ms. Schmidt and Ms. Lange on April 6, 2004. (L.Dane Tr. Ex. BK).

97. Later that day, Ms. Lange reviewed the draft memorandum and provided Ms. Schmidt with her last set of comments. (W.Schmidt Aff. ¶30, Ex. M).

98. On April 6, 2004, and into early April 7, 2004, Ms. Schmidt finalized her memorandum detailing Plaintiff's conduct and the conclusions that she reached based on her observations and the information that she had received. (W.Schmidt Tr. 10; 411-412; L.Dane Tr. Ex. BK; G.Yarnall Tr. Ex. G; W.Schmidt Aff. ¶3o, Ex. M). Ms. Schmidt's memorandum incorporated the sections that Ms. Dane and Ms. Lange had written. (W.Schmidt Tr. 10; 411-412; L.Dane Tr. Ex. BK; G.Yarnall Tr. Ex. G; W.Schmidt Aff. ¶30, Ex. M).

99. Ms. Schmidt determined that Plaintiff had engaged in gross misconduct, including but not limited to, fraudulently over-billing her case assignments, insubordination, deceitfulness and lack of integrity. (G.Yarnall Tr. Ex. G). Ms. Schmidt also believed that Plaintiff's behavior was unresponsive, unprofessional, and lacked accountability. (G.Yarnall Tr. Ex. G). Ms. Schmidt concluded that Plaintiff's employment should be terminated. (G.Yarnall Tr. Ex. G).

100. On April 7, 2004, at 9:21 A.M., Ms. Schmidt emailed George Harmon, Nancy Ginsburg, and Gerry Yarnall a copy of her memorandum recommending Plaintiff's termination. (G.Yarnall Tr. Ex. D, G). The memorandum was dated March 25, 2004 because that was the date that Ms. Schmidt had started working on it. (W.Schmidt Tr. 320-21).

101. Within hours of submitting her memorandum, Ms. Schmidt discovered that Plaintiff had made another misrepresentation to her. (W.Schmidt Tr. 404; P.Panzarino Tr. Ex. 24; W.Schmidt Aff. ¶¶27-29, Ex. J-L).

102. In response to Ms. Schmidt's question on April 6, 2004 about one of Plaintiff's Client Acceptance cases that had taken more time than usual to finalize, Plaintiff told Ms. Schmidt that the delay was because their vendor, Kroll, had been slow to respond to her request for background information. (W.Schmidt Tr. 404; P.Panzarino Tr. Ex. 24; W.Schmidt Aff. ¶¶27-28, Ex. J-K).

103.    Ms. Schmidt checked with the vendor in order to understand the reason for their delay.  (W.Schmidt Tr. 404; P.Panzarino Tr. Ex. 24; W.Schmidt Aff. ¶¶27-28, Ex. J-K).  Ms. Schmidt discovered that the vendor did not cause the delay as Plaintiff had claimed.  (W.Schmidt Tr. 404; P.Panzarino Tr. Ex. 24; W.Schmidt Aff. ¶¶27-28, Ex. J-K).

104.    Rather, Plaintiff had not ordered the required information in a timely manner.  (W.Schmidt Tr. 404; P.Panzarino Tr. Ex. 24; W.Schmidt Aff. ¶¶27-28, Ex. J-K).  Ms. Schmidt discovered that Plaintiff had requested the information more than a month later than it should have been requested.  (W.Schmidt Tr. 404; P.Panzarino Tr. 292-95, Ex. 24, 25).

105.    Ms. Schmidt asked Plaintiff to explain the discrepancy, but received no response.  (W.Schmidt Aff. ¶31, Ex. N).  Plaintiff now acknowledges that she forgot to request the information from the vendor.  (P.Panzarino Tr. 292-95).

106.    Ms. Schmidt forwarded the information relating to this incident to George Harmon on April 8, 2004.  (W.Schmidt Tr. 404-05; P.Panzarino Tr. 120; W.Schmidt Aff. ¶32, Ex. O).

**Plaintiff's April 7, 2004 Complaint (Cplt. ¶¶13, 15-17)**

107.    On April 7, 2004, at 9:26 a.m., after Ms. Schmidt had submitted her memorandum concluding that Plaintiff's employment should be terminated, Plaintiff emailed a written complaint ("HR Complaint") to Anne Barton, a Manager-level Employee Relations representative in Deloitte's Human Resources Department.  (P.Panzarino Tr. Ex. 39, 52; A.Barton Aff. ¶8, Ex. 1).

108.    Ms. Barton worked in Deloitte's Wilton, Connecticut office.  (A.Barton Aff. ¶5).

109.    Plaintiff emailed Ms. Barton the exhibits to her HR Complaint from 9:26 A.M. until 9:46 A.M.  (P.Panzarino Tr. Ex. 52; A.Barton Aff. ¶8, Ex. 1).

110.    Plaintiff's HR Complaint made allegations regarding Ms. Schmidt's conduct in the BIS Group. (P.Panzarino Tr. Ex. 39).  Plaintiff alleged, in part, that Ms. Schmidt had made comments regarding pregnancy which caused Plaintiff to question Ms. Schmidt's view on hiring, retaining and developing women in their "childbearing years." (P.Panzarino Tr. Ex. 39).

111.    Plaintiff did not allege that Ms. Schmidt had taken any adverse action against any member of the BIS Group, including herself, because the person was a woman in her childbearing years. (P.Panzarino Tr. Ex. 39).

112.    Upon receiving the HR Complaint from Plaintiff, Ms. Barton called Mr. Harmon and informed him of Plaintiff's HR Complaint. (A.Barton Aff. ¶¶12, 13).

113.    Mr. Harmon told Ms. Barton that Deloitte was already in the process of terminating Plaintiff's employment based on Ms. Schmidt's memorandum. (A.Barton Aff. ¶13).

114.    Plaintiff and Ms. Barton agreed that Plaintiff would be placed on paid administrative leave while Deloitte investigated the substance of her HR Complaint. (P.Panzarino Tr. 617; A.Barton Aff. ¶11).

115.    Mr. Harmon sent an email to Ms. Schmidt, Ms. Ginsburg and Mr. Yarnall to inform them that Plaintiff was being placed on a paid administrative leave and that her termination was on hold. (G.Yarnall Tr. Ex. D).

116.    In her HR Complaint, Plaintiff listed six points that she claimed supported her allegation that Ms. Schmidt had discriminated against women of childbearing years. (P.Panzarino Tr. Ex. 39).

117.    All of the events identified in the six points occurred before March 25, 2004. (P.Panzarino Tr. Ex. 39).

118.    Plaintiff had not complained to Deloitte about Ms. Schmidt allegedly discriminating against women of childbearing years before she submitted her HR Complaint on April 7, 2004.  (P.Panzarino Tr. Ex. 39)

### Points in the HR Complaint Relating to Plaintiff's Allegation of Discrimination Against Women of Childbearing Years

#### Point One

119.    Ms. Schmidt met Linda Justice for lunch in the fall of 2003.  (P.Panzarino Tr. Ex. 39).  Ms. Schmidt said to Ms. Justice that she (Ms. Schmidt) needed to populate the group with more males due to the women in her group going out on maternity leave.  (P.Panzarino Tr. Ex. 39).

120.    Plaintiff was not present for this conversation.  (P.Panzarino Tr. 585-86).

121.    Ms. Justice, who was married and of childbearing years at the time, did not think that Ms. Schmidt actually meant to hire more men because of the comment, nor did Ms. Justice think that her job was in jeopardy.  (L.Justice Tr. 130-31, 155, 245-47).  Ms. Justice was not concerned about what would happen if she got pregnant.  (L.Justice Tr. 245-47).

122.    Ms. Justice did not believe that Ms. Schmidt had or was discriminating against women of childbearing years.  (L.Justice Tr. 245-47).  Ms. Justice did not think that Ms. Schmidt's alleged comment called into question Ms. Schmidt's ability to make employment decisions regarding women of childbearing years.  (L.Justice Tr. 245-47).

#### Point Two

123.    On December 11, 2003, during a group dinner, Ms. Schmidt said that a pregnant employee in the BIS Group was ready to "pop."  (P.Panzarino Tr. Ex. 39).  Ms. Schmidt was

referring to BIS employee Toya Thompson-Tucker, who was not at the dinner.  (P.Panzarino Tr. 586).

124.    Ms. Schmidt also said during the dinner that everyone was getting "knocked up" in her group.  (P.Panzarino Tr. Ex. 39).  Other than Plaintiff and Ms. Schmidt, there were five women and three men present at the dinner.  (P.Panzarino Tr. Ex. 39).  Four of the five other women who were present at this dinner -- Linda Justice, Jeannie Rujikarn, Jessica Raskin and Lisa Dane -- were deposed in this action and none of them thought that Ms. Schmidt meant her comments in a serious manner.  (J.Rujikarn Tr. 48-49; L.Justice Tr. 154; L.Dane Tr. 127; J.Raskin Tr. 36-38).

125.    Plaintiff used similar terms with co-workers to describe pregnant women in the BIS Group such as "preggy," "prego" and "knocked up."  (J.Schmidt Aff. ¶¶19-22, Ex. R-U).

### Point Three

126.    On or about January 5, 2004, Ms. Schmidt said that "more men were needed in BIS because all of the women were taking maternity leave."  (P.Panzarino Tr. Ex. 39).  Ms. Schmidt said this either before or after a conference call with the BIS employees in the New York office.  (P.Panzarino Tr. 589).

127.    Between December 2003 and February 2004, including the above instance, Plaintiff heard Ms. Schmidt make this comment a total of two or three time in group settings with both male and female members of the BIS Group present.  (P.Panzarino Tr. 589-90).

128.    Ms. Schmidt's comments did not cause Plaintiff to think that her job was in jeopardy.  (P.Panzarino Tr. 604-05).

### Point Four

129.     On or about January 7, 2004, Plaintiff was informed by Ms. Lange of an interaction between Magda Long and Ms. Schmidt in Chicago.  (P.Panzarino Tr. Ex. 39).

130.     Ms. Schmidt had responded to Ms. Long's inquiry into a new global client acceptance project by saying that there was a lot of travel involved in the global project and that Ms. Long wouldn't want it "because she will probably be 'knocked up' soon."  (P.Panzarino Tr. Ex. 39).  This conversation took place in Ms. Schmidt's hotel room in Chicago.  (M.Long Tr. 46).

131.     Ms. Long was not offended by Ms. Schmidt's comment.   (M.Long Tr. 48; H.Lange Tr. 178).  Ms. Long though the comment was meant as a joke and thought it was funny. (M.Long Tr. 48).

132.     Plaintiff was not present for this conversation and never spoke to Ms. Long about what actually occurred.  (P.Panzarino Tr. 594-95).

### Point Five

133.     On March 3, 2004, Plaintiff received an email from Ms. Lange which related a conversation that Ms. Lange purportedly had with Ms. Justice, where Ms. Lange and Ms. Justice were discussing a conversation that Ms. Justice had with Ms. Schmidt.  (P.Panzarino Tr. Ex. 39).

134.     In the email, Ms. Lange wrote that Ms. Schmidt told Ms. Justice that Ms. Schmidt hired Jeff Giddings, a recently hired male Manager in the BIS Group, because "she needed to populate BIS with more males, because all of the women are going on maternity leave." (P.Panzarino Tr. 595, Ex. 39).

135.     Ms. Schmidt did not tell Ms. Justice that Mr. Giddings was hired because women were going on maternity leave.  (L.Justice Tr. 164-65).

136.     Ms. Justice does not recall telling Ms. Lange words to that effect.  (L.Justice Tr. 164-65).  Ms. Lange does not recall Ms. Justice telling her that Ms. Schmidt said words to that effect.  (H.Lange Tr. 182-84).

137.     Ms. Lange testified that she often over-dramatized statements in emails and that the comment attributed to Ms. Schmidt in the email does not make "sense" since Ms. Lange knew why Mr. Giddings was hired into the BIS Group, namely that "he has an expertise in international investigations and his work was known to various members in BIS."  (H.Lange Tr. 182-84).

### Point Six

138.     On or about March 4, 2004, Ms. Justice and Ms. Schmidt were having a one-on-one conversation in San Francisco, California.  (L.Justice Tr. 243).

139.     Ms. Justice told Ms. Schmidt that her sister was having problems becoming pregnant, and Ms. Justice questioned whether she might have similar problems.  (L.Justice Tr. 243).  Ms. Schmidt asked Ms. Justice about her plans regarding having children and whether she was using birth control.  (L.Justice Tr. 243, P.Panzarino Ex. 39).  Ms. Schmidt also mentioned the fact that plenty of partners at Deloitte had children.  (L.Justice Tr. 243; W.Schmidt Tr. 156-57; 435-36).

140.     Plaintiff was not present for this conversation.  (P.Panzarino Tr. 597).

141.     Ms. Justice thought Ms. Schmidt was only trying to make friendly conversation and not trying to make her uncomfortable.  (L.Justice Tr. 243).  As a result of Ms. Schmidt's inquiry, Ms. Justice did not think that her job was in jeopardy, nor was she concerned about what would happen if she got pregnant.  (L.Justice Tr. 245).

142.     Ms. Justice did not think that Ms. Schmidt's inquiry called into question Ms. Schmidt's ability to make employment decisions regarding women of childbearing years. (L.Justice Tr. 245).

**Ms. Schmidt's Treatment of Women of Childbearing Years**

143.     Ms. Schmidt did not discriminate against women in the BIS Group who were of childbearing years. (P.Panzarino Tr. 745-58).

144.     The way Ms. Schmidt treated her employees was a function of her personal feelings towards them, and not based on gender or whether the individual was a woman of childbearing years. (P.Panzarino Tr. 755).

145.     Plaintiff testified that she believed Ms. Schmidt treated her in a hostile or harassing manner because Plaintiff had spoken to Gerry Yarnall in February 2003, and not because Plaintiff is a woman of childbearing years. (P.Panzarino Tr. 608-09, 750-51, 757).

146.     All of the individuals that Plaintiff thought Ms. Schmidt favored were women. (P.Panzarino Tr. 757, Ex. 39).

147.     At all relevant times, Ms. Schmidt has been married with three children (W.Schmidt Tr. 5-6).

148.     At all relevant times, Ms. Schmidt was Deloitte Financial Advisory Services national leader of its Women's Initiative Network ("WIN"). (W.Schmidt Aff. ¶4).  In her role as a WIN leader, Ms. Schmidt was responsible for the development and oversight of programs aimed at the retention, promotion and recruitment of women at Deloitte.  (W.Schmidt Aff. ¶5). Ms. Schmidt also is a member of the board of directors of the National Association of Women Lawyers, and on the advisory board of the Women in Law Empowerment Forum in New York City.  (W.Schmidt Aff. ¶6).

149.    When Plaintiff joined the BIS Group, there were already six other Associates and Managers, excluding Ms. Schmidt, present. (W.Schmidt Aff. ¶7). Of those six employees, five were women. (W.Schmidt Aff. ¶7). At the time of Plaintiff's termination, all five were still employed in the BIS Group. (W.Schmidt Aff. ¶8).

150.    From December 2001 until April 2004, Ms. Schmidt hired thirteen individuals -- Associate level or above -- to work on Client Service and Client Acceptance work in the BIS Group. (W.Schmidt Aff. ¶9). Of those thirteen hires, eleven were women. (W.Schmidt Aff. ¶9). On April 7, 2004, there were nineteen Associates and Managers, excluding Ms. Schmidt, in the BIS Group, sixteen of whom were female. (W.Schmidt Aff. ¶10).[12]

151.    Plaintiff testified that she believed that all but one of the women were of childbearing years. (P.Panzarino Tr. 751-52).

152.    In or about early February 2004, Jeff Giddings was hired as a Manager in the BIS Group. (W.Schmidt Tr. 191). Mr. Giddings was the third male hired into the BIS Group. (W.Schmidt Aff. ¶¶9-10).

153.    This was the only example of any decision that Ms. Schmidt made that Plaintiff thought may have been impacted by Ms. Schmidt's treatment of women of childbearing years or called into question Ms. Schmidt's ability to evaluate women of childbearing years. (P.Panzarino Tr. 589-604, 766-67).

154.    Plaintiff did not think her job was less secure because Mr. Giddings was hired into the BIS Group. (P.Panzarino Tr. 604-05).

---

[12] The Managers and Associates in the BIS Group in April 2004 were Pam Panzarino, Holly Lange, Lisa Dane (Corcoran), Jessica Raskin, Jeannie Rujikarn, Magda Long, Chris Procopis, Carmen Sosa, Kristen Moore (Kalciak), Anne DiFranzo (Copper), Linda Justice, Toya-Thompson-Tucker, Kari Crowley (Gutowski), Yonina Wind (Fishoff), Jeff Giddings, Steven Bidwa, Caroline Parks, Cathy LeBlanc, and Kristen Manis (Wergeles).(W.Schmidt Aff. ¶11).

155.    Ms. Schmidt believed that Mr. Giddings was a unique talent regarding global client service work.  (W.Schmidt Tr. 267).  Ms. Schmidt was familiar with Mr. Giddings before he was hired at Deloitte.  (W.Schmidt Tr. 267).  Six years prior, in 1998, when Ms. Schmidt worked at PWC, she had attempted to hire Mr. Giddings by offering employment at PWC in her group.  (W.Schmidt Tr. 267).  At that time, Mr. Giddings declined Ms. Schmidt's offer.  (W.Schmidt Tr. 267).

156.    In late December of 2003, Mr. Giddings contacted Ms. Schmidt stating he was interested in joining the BIS Group.  (W.Schmidt Tr. 267).

157.    On January 5, 2004, Plaintiff interviewed Mr. Giddings prior to his employment into the BIS Group.  (P.Panzarino Tr. 639-42, Ex. 40).  Plaintiff completed an interview form of her impressions of Mr. Giddings and rated him as "Outstanding", the highest rating, in every category.  (P.Panzarino Tr. 639-42, Ex. 40, 41).  Plaintiff wrote "Jeffery is a strong candidate who would be an asset to our group.  I believe his marketing experience and contacts in the field will be an addition to our group."  (P.Panzarino Tr. 639-42, Ex. 40, 41).

158.    Two days later, Plaintiff emailed Ms. Justice and informed her that Plaintiff and a co-worker had taken Mr. Giddings to lunch "… and it went very well.  He is very bright and articulate and he has a book of business.  You would love him…very professional and polished. It looks like he is going to be hired and I think it is a good choice."  (P.Panzarino Tr. 643, Ex. 42).

159.    Plaintiff did not feel that her job in jeopardy as a result of Mr. Giddings' hiring. (P.Panzarino Tr. 604-05; 704).

**Deloitte's Investigation of Plaintiff's HR Complaint (Cplt. ¶17-19)**

160.    Within forty-eight (48) hours of receiving Plaintiff's HR Complaint, Deloitte retained Laura Allen, Esq., of the law firm Sidley Austin Brown & Wood LLP, to conduct an investigation into the substance of Plaintiff's HR Complaint. (A.Barton Aff. ¶14; L.Allen Tr. 13-14).

161.    Ms. Allen also was asked to look into the circumstances surrounding Ms. Schmidt's decision to terminate Plaintiff, and to reach a conclusion as to whether that decision was made in good faith and was justified by the facts that Ms. Schmidt had relied upon. (Barton Aff. ¶14; L.Allen Tr. 15-16).

162.    Ms. Allen has been conducting investigations of internal complaints in the employment field for over twenty (20) years. (L.Allen Tr. 16).

163.    On April 13, 2004, Ms. Allen interviewed Ms. Barton in connection with her investigation. (A.Barton Aff. ¶16; L.Allen Tr. 37-38). Ms. Allen and Ms. Barton compiled a list of all of the individuals that Ms. Allen would interview based on who was identified in Plaintiff's HR Complaint as having some first hand knowledge of the events. (A.Barton Aff. ¶16; L.Allen Tr. 37-39).

164.    Ms. Allen reviewed Plaintiff's HR Complaint, Ms. Schmidt's memorandum, and other documents and emails relevant to Plaintiff's allegations and the proposed termination of Plaintiff's employment. (L.Allen Tr. 38).

165.    Ms. Allen interviewed Plaintiff, Ms. Schmidt, Ms. Lange, Ms. Dane, Ms. Ginsburg, Mr. Yarnall, Mr. Zuber, Ms. Long, Ms. Fishoff, Ms. Raskin, and Ms. Justice. (L.Allen Tr. 37).

166.     On May 1, 2004, prior to finalizing her report, Ms. Allen received an email from Plaintiff asking her to interview several more witnesses whom Plaintiff thought may have knowledge of facts relevant to the investigation. (L.Allen Tr. 38, 174-75; A.Barton Aff. ¶19, Ex. 4).  Plaintiff had not previously informed anyone at Deloitte that it was necessary to speak to these individuals. (A.Barton Aff. ¶19, Ex. 4).

167.     Based on Plaintiff's e-mail, Ms. Allen interviewed Ms. Thompson-Tucker, Ms. Rujikarn, Ms. Moravec, Mr. Procopis, Carmen Sosa (Associate) and Kristen Wergeles (Associate). (P.Panzarino Tr. 815; L.Allen Tr. 38, 174-75; A.Barton Aff. ¶20).

168.     After Ms. Allen interviewed the additional witnesses, she incorporated their information into her report. (L.Allen Tr. 38, 174-75).

169.     Plaintiff did not state to Ms. Allen, or in her HR Complaint, that she thought that she was subjected to any adverse employment decisions based on her gender or childbearing status. (P.Panzarino Ex. 39; J.Schmidt Aff. ¶23, Ex. V).

170.     On May 19, 2004, Ms. Allen submitted a final report to Deloitte which summarized the results of her investigation. (J.Schmidt Aff. ¶23, Ex. V). Ms. Allen determined that Ms. Schmidt's "remarks in context do not appear to reflect discriminatory intent, and Ms. Schmidt's actual practices toward female employees contradict any inference that she has in fact deprived women of opportunities based on sex or family status." (J.Schmidt Aff. ¶23, Ex. V).

171.     In summary, Ms Allen concluded:

> There is no credible evidence that Ms. Schmidt has engaged in discrimination on grounds of sex, childbearing status, or any other unlawful ground alluded to by Ms. Panzarino.
>
> * * *
>
> We believe that Ms. Schmidt's concerns about Ms. Panzarino's performance and behavior, including her lack of truthfulness, are justified by the evidence. We also believe that there is little or no prospect that Ms. Panzarino can develop a

productive and trustful working relationship within the Client Acceptance group. In the circumstances, we recommend that the Firm follow through on the planned termination of her employment, or at least her removal from Ms. Schmidt's group.

\* \* \*

The record establishes that Ms. Schmidt's concerns about Ms. Panzarino's productivity and commitment preceded Ms. Panzarino's April 7, 2004 complaint, and therefore could not be in retaliation for it. Nor is there any evidence that Ms. Schmidt's decision to terminate Ms. Panzarino is causally related to her earlier complaints in 2003.

(J.Schmidt Aff. ¶23, Ex. V).

172.    Based on Ms. Allen's conclusions, Deloitte proceeded with Ms. Schmidt's original decision to terminate Plaintiff's employment. (A.Barton Aff. ¶23).

173.    On May 12, 2004, Ms. Allen and Ms. Barton met with Plaintiff at Ms. Allen's office to go over Ms. Allen's findings and conclusions. (P.Panzarino Tr. 815; A.Barton Aff ¶24; L.Allen Tr. 35-36).   Ms. Allen informed Plaintiff that her investigation revealed that Ms. Schmidt had not engaged in any unlawful behavior. (A.Barton Aff. ¶25).  Plaintiff was told that she would not be permitted to return to the BIS Group. (A.Barton Aff. ¶25; L.Allen Tr. 205).

174.    Ms. Barton informed Plaintiff that Deloitte would assist her in looking for another position within Deloitte, but outside of the BIS Group. (A.Barton Aff. ¶26, 27; L.Allen Tr. 205-06).   Ms. Barton put Plaintiff in contact with "Carley Coleman from Deloitte's Career Connections department to assist [Plaintiff] with the process of submitting her resume to other partners within Deloitte that had job openings." (A.Barton Aff. ¶28).[13]   Ms. Coleman assisted Plaintiff in identifying and applying for available positions within Deloitte. (A.Barton Aff. ¶29).

175.    After searching, Ms. Coleman informed Ms. Barton that there were no open positions within Deloitte for which Plaintiff was qualified. (A.Barton Aff. ¶30).

---

[13] "Deloitte's Career Connections is an internal career management program dedicated to providing career coaching services to Deloitte employees, including assisting employees in finding other positions within Deloitte, and helping employees put together their resumes to apply for positions outside of Deloitte." (A.Barton Aff. ¶29).

176.    On May 21, 2004, Plaintiff met with Ms. Barton at Deloitte's Wilton, Connecticut office.    (A.Barton Aff. ¶31; P.Panzarino Tr. 819).    Ms. Barton informed Plaintiff that her employment with Deloitte was being terminated.  (A.Barton Aff. ¶31; P.Panzarino Tr. 819).

**Deloitte's Counseling of Wendy Schmidt**

177.    Deloitte asked Ms. Allen to coach Ms. Schmidt on certain aspects of her leadership style.  (W.Schmidt Tr. 339-48; L.Allen Tr. 190-92).

178.    Ms. Allen met with Ms. Schmidt and Mr. Zuber at Ms. Allen's office to review the findings of her investigation.  (W.Schmidt Tr. 437-448; L.Allen Tr. 190-92).

179.    Ms. Allen counseled Ms. Schmidt that certain comments attributed to her, although innocently intended, appeared to have made some employees uncomfortable. (W.Schmidt Tr. 437-48).  Ms. Allen coached Ms. Schmidt that comments about hiring men, even in the context of a predominately female group, can be misconstrued, and that Ms. Schmidt should be more sensitive going forward and not make comments like that.  (W.Schmidt Tr. 437-48).  Ms. Allen counseled Ms. Schmidt that she should not refer to pregnant women in the workplace as having been "knocked up."  (W.Schmidt Tr. 339-44; L.Allen Tr. 190-92).  Ms. Allen also told Ms. Schmidt that she should refrain from using foul language in the workplace. (W.Schmidt Tr. 339-44; L.Allen Tr. 190-92).

180.    As an additional counseling step, Ms. Allen spoke with an external coach who was working with Ms. Schmidt on her leadership and management style.  (L.Allen Tr. 190).  Ms. Allen shared the findings of her investigation with the coach in order to assist Ms. Schmidt in the future.  (W.Schmidt Tr. 445-46; L.Allen Tr. 190).    Ms. Schmidt and the external coach subsequently met and addressed the same issues together.  (W.Schmidt Tr. 445-46).

181.    Plaintiff does not allege that Ms. Schmidt engaged in any harassing conduct after Plaintiff made her HR Complaint on April 7, 2004.  (P.Panzarino Tr. Ex. 61).

**Plaintiff's EEOC Complaint**

182.    Plaintiff filed a charge of discrimination with the Equal Opportunity Employment Commission ("EEOC") on January 18, 2005 ("EEOC Charge").  (P.Panzarino Tr. Ex. 61).

183.    Plaintiff alleged in her EEOC Charge that Ms. Schmidt created a hostile work environment because Plaintiff is a woman of childbearing years.  (P.Panzarino Tr. Ex. 61).

184.    Plaintiff also alleged that she was subjected to retaliation by Ms. Schmidt in connection with her HR Complaint. (P.Panzarino Tr. Ex. 61).

185.    Ms. Schmidt was not aware that Plaintiff intended to file her HR Complaint prior to Plaintiff submitting her complaint to Anne Barton.  (W.Schmidt Tr. 417-418; A.Barton Aff. ¶17; L.Dane Tr. 115).

186.    Plaintiff does not have any first hand knowledge that Ms. Schmidt was aware of the HR Complaint prior to the time when Ms. Schmidt recommended Plaintiff's termination. (P.Panzarino Tr. 799).

187.    Plaintiff told Linda Justice, Chris Procopis and possibly Jeannie Rujikarn about her intention to file her HR Complaint.  (P.Panzarino Tr. 771-72).  None of these individuals notified Ms. Schmidt of Plaintiff's intention to file an HR Complaint.  (P.Panzarino Tr. 797; C.Procopis Tr. 43; J.Rujikarn Tr. 97; L.Justice Tr. 175).

188.    Plaintiff did not assert in her EEOC Charge a claim for retaliation in connection with her complaint to Gerry Yarnall in February 2003.  (P.Panzarino Tr. Ex. 61).  In her EEOC Charge, there is no reference to Gerry Yarnall, to making a complaint in 2003 or the nature of that complaint.  (P.Panzarino Tr. Ex. 61).

189.     Plaintiff did not claim in her EEOC Charge that she suffered any adverse employment actions because of the hostile work environment or because she is a woman of child bearing years. (P.Panzarino Tr. Ex. 61).

190.     Plaintiff had the assistance of counsel prior to filing her EEOC Charge and was represented by counsel during the investigation of her EEOC Charge. (P.Panzarino Tr. 714-18; P.Panzarino Tr. Ex. 61; J.Schmidt Aff. ¶¶24-25, Ex. W-X). Steven Rosen, her counsel, notarized Plaintiff's signature on the EEOC Charge. (P.Panzarino Tr. Ex. 61).

191.     On May 12, 2005, the EEOC sent Mr. Rosen a letter requesting that Plaintiff submit a rebuttal to Deloitte's response to Plaintiff's sexual harassment allegation and retaliation claim by June 3, 2005. (J.Schmidt Aff. ¶24, Ex. W).

192.     Plaintiff's counsel contacted the EEOC and they agreed upon an extension of time until June 24, 2005, however, either Plaintiff nor her counsel ever submitted a rebuttal as agreed. (J.Schmidt Aff. ¶25, Ex. X).

193.     On July 6, 2005, the EEOC issued a Dismissal and Notice of Rights. (P.Panzarino Tr. Ex. 61; J.Schmidt Aff. ¶25, Ex. X).

**The Complaint in this Action**

194.     On October 3, 2005, Plaintiff filed her complaint in this action, No 05 Civ. 8502, in the United States District Court for the Southern District of New York ("SDNY Complaint"). (P.Panzarino Tr. Ex. 61).

195.     Plaintiff alleged in her SDNY Complaint that she was discharged from her employment with Deloitte in retaliation for making her HR Complaint. (P.Panzarino Tr. Ex. 61).

196.    Plaintiff also alleged in her SDNY Complaint that her supervisor, Wendy Schmidt, learned of her intention to file her HR Complaint before she submitted it and "began to harass her." (P.Panzarino Tr. 770, Ex. 61).

197.    Plaintiff alleged that Ms. Schmidt "began to harass her" by: a) on March 11, 2004, asking her to keep track of her administrative hours (supra ¶¶55-57); b) forwarding assignments in her jurisdiction to Holly Lange in Chicago during the weeks of March 15 and March 22, 2004 (supra ¶¶58, 60-61); and c) sending her a "series of harassing emails" from March 23 through March 25, 2004 (supra ¶¶68-72; infra ¶¶198-200).  (P.Panzarino Tr. 800, P.Panzarino Tr. Ex. 61).

198.    On March 25, 2004, Ms. Schmidt and Plaintiff exchanged a series of emails regarding global client acceptance project that they had discussed during their March 11, 2004 meeting.  (P.Panzarino Tr. 385).  Plaintiff informed Ms. Schmidt that she was not feeling well and suggested having other members of the BIS Group complete some of the tasks associated with the global client acceptance project.  (P.Panzarino Tr. Ex. 58).

199.    Ms. Schmidt responded, in part, that she would rather wait for Plaintiff to perform the work.  (P.Panzarino Tr. Ex. 58).  Ms. Schmidt wrote that "[t]his doesn't have to be done right away, so when you are feeling better you can do this.  You asked to assume a more managerial role and I am giving you the opportunity to step up to the plate here."  (P.Panzarino Tr. Ex. 58).

200.    Plaintiff apologized to Ms. Schmidt because she had been unclear about what Ms. Schmidt meant when Ms. Schmidt had asked her to manage the global client acceptance project.  (P.Panzarino Tr. Ex. 58).  Later that day, Ms. Schmidt and Plaintiff exchanged another series of emails about Plaintiff's role in the BIS Group.  (P.Panzarino Tr. Ex. 30).

201.     Plaintiff did not assert in her SDNY Complaint a claim for retaliation in connection with her complaint to Gerry Yarnall in February 2003.  (P.Panzarino Tr. Ex. 61).  The SDNY Complaint does not contain any reference to Gerry Yarnall, to making a complaint in 2003 or the nature of that complaint.  (P.Panzarino Tr. Ex. 61).

202.     In her SDNY Complaint, Plaintiff claimed that she was "upset" by Ms. Schmidt's comments because, as a "woman of childbearing age," Plaintiff "felt" that Ms. Schmidt "perceived her as a liability."  (P.Panzarino Tr. Ex. 61).

203.     In support of her claim, Plaintiff's HR Complaint contained six points. (P.Panzarino Tr. 510-11).  In addition, Plaintiff made the allegation that prior to March 25, 2004, she heard Ms. Schmidt use curse words like "[f]uck, fucking assholes, dicks" about once a month prior to March 25, 2004.  (P.Panzarino Tr. 510-11).  These curses were never directed at any member of the BIS Group.  (P.Panzarino Tr. 510-11).

204.     Notwithstanding any of Plaintiff's allegations, at all relevant times, Plaintiff testified that she did her job in the BIS Group to the best of her abilities and was able to perform her job well.  (P.Panzarino Tr. 706-07).  Plaintiff did not recognize that that there were any problems with her performance.  (P.Panzarino Tr. Ex. 61).

205.     In Plaintiff's opinion, "[a]t all relevant times plaintiff's employment was satisfactory to her employer.  She received no negative performance reviews, no disciplinary actions, nor any other indication that her work was unsatisfactory."  (P.Panzarino Tr. Ex. 61).  In Plaintiff's opinion, her performance in the BIS Group was always excellent.  (P.Panzarino Tr. Ex. 61).

206.     Plaintiff did not claim in her SDNY Complaint that she suffered any adverse employment actions because she is a woman of childbearing years.  (P.Panzarino Tr. Ex. 61).

Date:   September 19, 2008
New York, New York

/S/
_____

Jean L. Schmidt
Theo E.M. Gould
LITTLER MENDELSON
A Professional Corporation
900 Third Avenue
New York, NY 10022.4834
T:  (212) 497-8486
F:  (646) 417-7534
Attorneys for Defendant
Deloitte & Touche LLP