UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------- X
                                     :
PAM PANZARINO,                       :
                                     :
                   Plaintiff,        :
       v.                            :
                                     :
DELOITTE & TOUCHE LLP,               :
                                     :
                   Defendant.        :
                                     :
-----------------------------------X



05 Civ. 8502 (BSJ)(RLE)
**Opinion & Order**

**BARBARA S. JONES**
**UNITED STATES DISTRICT JUDGE**

On October 3, 2005, Plaintiff Pam Panzarino ("Plaintiff")
filed suit against Defendant Deloitte & Touche LLP ("Defendant"
or "Deloitte") asserting claims arising out of her employment
with and subsequent termination from Deloitte's Business
Intelligence Services Group.  Before the Court is Defendant's
Motion for Summary Judgment pursuant to Rule 56 of the Federal
Rules of Civil Procedure.  For the reasons set forth below,
Defendant's motion is GRANTED.

## BACKGROUND[1]

This case arises out of the employment and termination of Plaintiff from her position as a manager in the Business Intelligence Services Group ("BIS Group") at Deloitte.

Plaintiff alleges that employees of Defendant (1) created a hostile work environment for her on account of her sex and (2) harassed and ultimately terminated her in retaliation for her internal complaints, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq. ("Title VII"), New York State Human Rights Law, N.Y. Executive Law § 290, et seq. ("NYHRL"), and New York City Human Rights Law, N.Y.C. Administrative Code § 8-107, et seq. ("NYCHRL") (Compl. ¶¶ 2, 22, 26, 30.)

Plaintiff began her employment at Deloitte as a Senior Consultant in the Dispute Services Group on or about March 1997. (Def's. Rule 56.1 Stmt. ¶ 18; Pl.'s Rule 56.1 Stmt. ¶ 18.) Plaintiff was promoted to Manager on or about September 2000, and in or about November 2001 Plaintiff joined the BIS Group, a business unit of Forensic and Dispute Services at Deloitte, as a Manager.  (Id. ¶¶ 22-24.)  At that time, the BIS Group included

---

[1] The facts stated here are drawn from Defendant's Local Rule 56.1 statement and from Plaintiff's submissions.  Under Local Civil Rule 56.1(c), "material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted . . . ."  See also Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted.").

2

six employees (excluding Plaintiff), five of whom were women. (Id. ¶ 149.)[2]  One service provided by the BIS Group was client acceptance work, an abbreviated due diligence background search on potential clients of Deloitte.  (Id. ¶ 9.)  Plaintiff's duties at the BIS Group included conducting client acceptance research and drafting reports based on the results.  (Id. ¶ 27.) Most client acceptance requests were sent to a central e-mail account and Plaintiff, along with Holly Lange and another employee, would assign the requests that originated from their designated geographic region to BIS Group employees, including themselves.  (Id. ¶ 32.)  Plaintiff reported to Wendy Schmidt, a Principal of Deloitte who had created the BIS Group.  (Id. ¶ 32.)

Plaintiff was also responsible for supervising administrative assistants who paid vendor invoices for charges incurred by the BIS Group.  (Def's. Rule 56.1 Stmt. ¶ 29; Pl.'s Rule 56.1 Stmt. ¶ 29.)[3]  In or about January 2003, Schmidt discovered that during the preceding six months a vendor had over-billed the BIS Group by thousands of dollars.  (Id. ¶ 32.) Schmidt held Plaintiff and an administrative assistant under Plaintiff's supervision responsible for failing to uncover the

---

[2] At the time of Plaintiff's termination, all five women were still employed in the BIS Group. (Def's. Rule 56.1 Stmt. ¶ 149; Pl.'s Rule 56.1 Stmt. ¶ 149.)
[3] The parties dispute whether Plaintiff was responsible for ensuring the accuracy of vendor charges.  (Id. ¶ 29.)

over-billing.  (Id. ¶ 32.)  On January 28, 2003, the

administrative assistant notified Schmidt that she was resigning

her employment at Deloitte effective the next day. (Id. ¶ 38.)

On January 29, 2003, Plaintiff contacted Gerry Yarnall, a

Human Resources Partner at Deloitte, to discuss the over-billing

situation.  (Def's. Rule 56.1 Stmt. ¶ 39; Pl.'s Rule 56.1 Stmt.

¶ 39.)  Plaintiff contends that in addition to the over-billing

issue, Plaintiff intended to discuss "several of the problems in

the BIS group."  (Panzarino Aff. ¶ 17.)  However, according to

Plaintiff, before she could discuss these other items Schmidt

entered Yarnell's office and stated that if the meeting was

about her or the BIS Group, Schmidt wanted to be present.

(Panzarino Dep. 478:2-479:8, Dec. 6, 2006.)

On February 3, 2003, Plaintiff asked to meet with Yarnall a

second time.  (Def's. Rule 56.1 Stmt. ¶ 40; Pl.'s Rule 56.1

Stmt. ¶ 40.)  This meeting took place on February 6, 2003 at

Grand Central Station in New York City.  (Id. ¶ 40.)  Plaintiff

again discussed the over-billing situation but also raised a

host of other issues regarding Schmidt's behavior and management

of the BIS Group, including Plaintiff's belief that: a co-worker

had received preferential treatment by being permitted to take

many weeks of vacation during a busy period for the BIS Group;

Schmidt had cursed at a vendor; Schmidt's use of foul language

was inappropriate and upsetting to Plaintiff and others; and the

4

BIS Group lacked adequate controls and procedures. (Id. ¶¶ 41-42.) Plaintiff also told Yarnall that Schmidt had behaved inappropriately during a BIS Group meeting in 2002 by asking an African-American employee, Toya Thompson Tucker, to work on an engagement because the prospective clients were African American. (Pl.'s Rule 56.1 Stmt. ¶ 42.)

In advance of the February 6, 2003 meeting with Yarnall, Plaintiff had prepared two documents: an outline of Plaintiff's responsibilities in the BIS Group and a series of bullet points describing instances of Schmidt's behavior that Plaintiff considered inappropriate. (Def's. Rule 56.1 Stmt. ¶ 44; Pl.'s Rule 56.1 Stmt. ¶ 44.) Plaintiff testified that she created the latter document as a reference for herself for her conversation with Yarnall. (Panzarino Dep. 518:20-24, Dec. 6, 2006.) One bullet point on the document was: "Derogatory comments (Joanne, Toya . . . )." (Panzarino Dep., Ex. 51, Dec. 6, 2006). Although Plaintiff had intended to give Yarnall only a copy of the document outlining her responsibilities, at the conclusion of the meeting she handed him both documents. (Def's. Rule 56.1 Stmt. ¶ 45; Pl.'s Rule 56.1 Stmt. ¶ 45.) A few minutes later, when Plaintiff realized that she had also given Yarnall the bullet point document, she told Yarnall to "just disregard it." (Panzarino Dep. 521:16-18, Dec. 6, 2006.)

After his meeting with Plaintiff, Yarnall gave the bullet point document to George Zuber, the Managing Partner of the Forensic and Dispute Consulting Services practice at Deloitte, in order to solicit Zuber's guidance.  (Def's. Rule 56.1 Stmt. ¶ 46; Pl.'s Rule 56.1 Stmt. ¶ 46.)   Zuber then met with Schmidt to discuss Plaintiff's complaints and to review certain statements that appeared in the bullet point document.  (Schmidt Dep. 210:2-9, Oct. 11, 2007.)

Later that day, Zuber called Plaintiff into his office to discuss the bullet point document.  (Def's. Rule 56.1 Stmt. ¶ 46; Pl.'s Rule 56.1 Stmt. ¶ 46.)  Plaintiff told Zuber that Yarnall should not have shown the document to him because it was "off the record and confidential" and because Plaintiff had instructed Yarnall to disregard it.  (Panzarino Dep. 521:16-18, Dec. 6, 2006.)  According to Plaintiff, Zuber ripped up the document and told Plaintiff not to write down things that she did not want to be seen.  (Id. 527:5-6.)

Later that evening, Plaintiff sent an e-mail to Schmidt and a manager in Deloitte's Human Resources department stating that the bullet point document was "an old draft (before our clarification) of thoughts that addressed prior frustration" and that it had been written "in a state of frustration and shock over [the administrative assistant]'s abrupt resignation and the other unfortunate surrounding events."  (Panzarino Dep., Ex. 51,

Dec. 6, 2006). Plaintiff's e-mail also stated that Plaintiff had met with Yarnall "to seek advice on how to best approach you and further discuss my new role in BIS." (Id.).

Plaintiff alleges that during the following year Schmidt treated her poorly, ignoring her and addressing client acceptance inquiries to Lange (Panzarino Aff. ¶¶ 24-25.); commented frequently on pregnancies of BIS Group employees as problematic (Id. ¶ 27.); cursed often (Id.); made disparaging comments repeatedly about pregnant employees in group meetings, saying that the employees were "knocked up" or "about to pop" (Id. ¶ 28.); and said that she needed to hire more men since everyone in the BIS Group was going out on maternity leave (Id. ¶ 29.)[4] Despite these conditions, Plaintiff testified that she was able to perform her job satisfactorily and to the best of her abilities. (Def's. Rule 56.1 Stmt. ¶ 204-05; Pl.'s Rule 56.1 Stmt. ¶ 204-05.)

According to Plaintiff, in early March 2004, Plaintiff began to prepare a formal complaint about Schmidt's behavior for submission to Deloitte's national Human Resources office. (Panzarino Aff. ¶ 36.) Plaintiff alleges that she shared her

---

[4] In an e-mail from Lange to Plaintiff dated March 3, 2004, Lange stated that in "circa January" another Deloitte employee told Lange that Schmidt said she hired a male manager because "'we need to populate BIS with more men because the women are all having babies and going on maternity leave.'" (Pl.'s Ex. AT). This statement is inadmissible hearsay and cannot be relied upon in opposition to a motion for summary judgment. See Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997) ("[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment.").

intention to submit this complaint with several co-workers in the BIS Group. (Id. ¶¶ 38, 107.) One defense witness testified that about a month or six weeks before Plaintiff was terminated from employment at Deloitte, Plaintiff told the witness that Plaintiff was "getting increasingly frustrated" and "that she was going to talk to somebody about it." (Rujikarn Dep. 92:11-21, Jan. 18, 2007). The witness testified that Plaintiff's intention to take some sort of action "wasn't a secret or anything" in the BIS Group. (Rujikarn Dep. 93:2, Jan. 18, 2007).

In early March 2004, Schmidt instituted a productivity review of the BIS Group's client acceptance team. (Def's. Rule 56.1 Stmt. ¶ 51; Pl.'s Rule 56.1 Stmt. ¶ 51.) On March 11, 2004, Schmidt met with Plaintiff to discuss Plaintiff's performance and responsibilities with respect to client acceptance work. (Def's. Rule 56.1 Stmt. ¶¶ 55-56; Pl.'s Rule 56.1 Stmt. ¶¶ 55-56.) Plaintiff testified that Schmidt agreed with Plaintiff that her performance was comparatively good. (Panzarino Dep. 173:9-10, Dec. 6, 2006.) Nevertheless, Schmidt asked Plaintiff to account for her administrative time more precisely so Schmidt could better track Plaintiff's progress on assignments. (Def's. Rule 56.1 Stmt. ¶ 56; Pl.'s Rule 56.1 Stmt. ¶ 56.) By the end of the meeting, Plaintiff felt

"positive" and "okay about everything." (Panzarino Dep. 610:11-15, Dec. 6, 2006.)

In her deposition, Lange testified that following this meeting Schmidt told Lange that Plaintiff had said to Schmidt that Lange was "hogging" client acceptance management responsibilities and that Lange did only a fraction of the work an administrative assistant did. (Lange Dep. 220:17-22, 224:14-17, Sept. 11, 2007.) Plaintiff claims that "Schmidt falsely reported to Lange what transpired at the meeting, sowing seeds of discord between the client acceptance co-managers." (Pl.'s Rule 56.1 Stmt. ¶ 57.)

During the week of March 15, 2004, Schmidt forwarded to Lange a voicemail concerning a high priority client acceptance request arising out of the New York area relating to a well-known individual. (Def's. Rule 56.1 Stmt. ¶ 58; Pl.'s Rule 56.1 Stmt. ¶ 58.) Plaintiff was the manager responsible for client acceptance cases in the region encompassing New York. (Panzarino Dep. 214:14-215:13, Dec. 6, 2006.) When Plaintiff asked Schmidt why she had forwarded this request to Lange rather than to Plaintiff, Schmidt replied that she "did not even take the time to think about where it was coming from" and that she "always forward[s] everything client acceptance to Holly, and then let[s] her figure it out." (Panzarino Dep., Ex. 18, Dec. 6, 2006.)

During a BIS Group training session the next week, Schmidt referred certain client acceptance questions to Lange.  (Def's. Rule 56.1 Stmt. ¶ 61; Pl.'s Rule 56.1 Stmt. ¶ 61.)  After the training session, and in front of the entire BIS Group, Schmidt asked Plaintiff to do a media search.  (Id. ¶ 62.)  Plaintiff responded that another worker in the group might be better able to handle the assignment at that time.  (Id. ¶ 63.)  Schmidt took this as a refusal to do the search.  (Def's. Rule 56.1 Stmt. ¶ 63.)  Plaintiff argues that she did not refuse, but rather, "[c]onsistent with her role as co-manager with responsibility for assigning client acceptance work," she recommended another BIS Group employee for the search.  (Pl.'s Rule 56.1 Stmt. ¶ 63.)

Following the meeting, Schmidt consulted with Lange about Plaintiff's workload.  (Def's. Rule 56.1 Stmt. ¶ 65; Pl.'s Rule 56.1 Stmt. ¶ 65.)  Lange told Schmidt that Plaintiff's workload did not appear to be so heavy as to preclude the additional media search.  (Id. ¶ 67.)[5]  Schmidt then sent an e-mail to Plaintiff expressing her dissatisfaction, stating that "I felt your refusal, particularly in front of new staff members, did not set a good example."  (Id. ¶¶ 68-69.)  Plaintiff responded that she had worked all day Sunday (the day before) on a

---

[5] Plaintiff argues that Lange's statement is inadmissible hearsay.  (Pl.'s Rule 56.1 Stmt. ¶ 67.)  The Court considers this statement only for its effect on Schmidt, not for the truth of the matter asserted.  See Fed. R. Evid. 801(c).

priority client acceptance case and had another one due Monday plus two additional cases. (Id. ¶ 70.)

During the week of March 22, 2004, Schmidt asked Lange to examine some of Plaintiff's recent cases to see whether Plaintiff had accurately reported her time. (Def's. Rule 56.1 Stmt. ¶ 80; Pl.'s Rule 56.1 Stmt. ¶ 80.) Schmidt also asked Lange to assign another group member to replicate Plaintiff's research for a few client acceptance cases to see if the time Plaintiff had charged to them was reasonable. (Id. ¶ 81.) The assigned employee replicated two client acceptance cases that Plaintiff had worked on during the week ending March 20, 2004, completing one case in one hour and the other in two hours. (Id. ¶¶ 84-86.) According to a summary prepared by Lange, Plaintiff had billed seven hours to each case. (Lange Dep., Ex. BE, Sept. 11, 2007).[6]

According to Defendant, during this period Schmidt also learned that Plaintiff had completed another client acceptance case in one hour and forty-five minutes, yet had billed six hours to the case. (Def's. Rule 56.1 Stmt. ¶ 88.) Plaintiff counters that the amount of time a researcher spends using an

---

[6] Plaintiff argues that the assigned group member was one of the fastest researchers in the group; that Lange signaled to the group member that the request was unusual by indicating that the e-mail request was of "high" importance; that the time allotted to such projects under BIS protocol was far greater than one or two hours; and that such "shadow" research is inherently unfair as client acceptance research is highly individualized and involves the exercise of judgment. Pl.'s Rule 56.1 Stmt. ¶¶ 83-86.

11

online database does not accurately reflect the amount of time the researcher spends on a project, as researchers often review results off-line to reduce database expenses.  (Pl.'s Rule 56.1 Stmt. ¶ 88.)

On or about March 25, 2004, Schmidt contacted Deloitte's Human Resources department regarding Plaintiff's conduct and the potential for her termination from the BIS Group.  (Def's. Rule 56.1 Stmt. ¶ 80; Pl.'s Rule 56.1 Stmt. ¶ 80.)  Also on March 25, 2004, Schmidt began drafting a memorandum regarding Plaintiff's conduct.  (Id. ¶ 90.)  Lange testified that at Schmidt's request she prepared an "evidence summary" of Plaintiff's job performance which included information on the replicated research.  (Id. ¶ 91.)  Schmidt explained to Lange that Schmidt would be incorporating this information into a memorandum to be presented to "legal and HR."  (Id. ¶ 94.)

On or about April 1, 2004, Schmidt contacted George Harmon, an Employee Relations manager in Deloitte's Human Resources Department to discuss Plaintiff's conduct.  (Def's. Rule 56.1 Stmt. ¶ 95; Pl.'s Rule 56.1 Stmt. ¶ 95.)  Schmidt told Harmon that she intended to terminate Plaintiff's employment based on the results of her investigation and that she would document the basis for her decision and forward it to him.  (Id. ¶ 95.)  From April 1 to April 6, 2004, while Plaintiff was away on vacation, Schmidt solicited input and comments from other Deloitte

managers on a draft memorandum detailing Plaintiff's conduct and the conclusions Schmidt had reached. (Id. ¶ 98.) In the memorandum, Schmidt concluded that Plaintiff had engaged in gross misconduct, including over-billing, insubordination, deceitfulness, lack of integrity, and unprofessional behavior. (Yarnall Dep., Ex. G, Dec. 12, 2006.) Schmidt's memo also referred to the incident the prior year when Plaintiff had complained to Yarnall: "[I]ssues regarding Pam's competencies and commitment to the BIS practice were raised almost a year ago. However, at that time, no action was taken. Since then, it is clear to me that Pam cannot succeed in this practice." (Id.)

On April 7, 2004, at 9:21 A.M., Schmidt e-mailed Harmon, Ginsburg and Yarnall a copy of her memorandum recommending Plaintiff's termination. (Def's. Rule 56.1 Stmt. ¶ 100; Pl.'s Rule 56.1 Stmt. ¶ 100.)[7] Five minutes later, at 9:26 A.M., Plaintiff e-mailed a written complaint (the "2004 HR Complaint") to Anne Barton, an Employee Relations manager in Deloitte's Human Resources Department. (Id. ¶ 107.)[8]

---

[7] The memorandum was dated March 25, 2004. (Def's. Rule 56.1 Stmt. ¶ 100; Pl.'s Rule 56.1 Stmt. ¶ 100.) Plaintiff claims that "Schmidt, a lawyer, backdated [the memorandum] to March 25, 2004, a date nearly two weeks before its submission." Pl.'s Rule 56.1 Stmt. ¶ 100. Defendant responds that March 25, 2004 was when Schmidt had began working on the memorandum. Def's. Rule 56.1 Stmt. ¶ 100.

[8] Plaintiff e-mailed Barton exhibits to the 2004 HR Complaint from 9:26 A.M. until 9:46 A.M. (Def's. Rule 56.1 Stmt. ¶ 109; Pl.'s Rule 56.1 Stmt. ¶ 109.) Plaintiff asserts that prior to e-mailing her complaint, "Plaintiff had been on the telephone with Anne Barton [in Human Resources] seeking guidance on

Plaintiff's 2004 HR Complaint alleged that Schmidt made comments regarding pregnancy which caused Plaintiff to question Schmidt's views on hiring, retaining and developing women in their childbearing years at Deloitte and that Schmidt created a hostile work environment for Plaintiff in retaliation for Plaintiff's previous complaints to Yarnall in 2003. (Id. ¶ 110.)[9] Plaintiff did not allege—either explicitly or in substance—that Schmidt had taken any adverse action against any member of the BIS Group, including herself, because the person was a woman in her childbearing years. (Id. ¶ 111.)[10] Plaintiff and Barton agreed that Plaintiff would be placed on paid administrative leave while Deloitte investigated the substance of her 2004 HR Complaint. (Id. ¶ 114.)

Two days after receiving Plaintiff's 2004 HR Complaint Deloitte retained Laura Allen, a partner with the law firm Sidley Austin Brown & Wood LLP, to conduct an investigation into the substance of Plaintiff's 2004 HR Complaint and the circumstances surrounding Schmidt's decision to terminate Plaintiff. (Def's. Rule 56.1 Stmt. ¶¶ 160-61; Pl.'s Rule 56.1

---

how to submit the internal complaint" and that Deloitte therefore received actual notice of Plaintiff's complaint prior to receiving Schmidt's memorandum. (Pl.'s Rule 56.1 Stmt. ¶ 107).
[9] The parties agree that Plaintiff had not complained formally to Deloitte about Schmidt's alleged discrimination against women of childbearing years before she submitted her 2004 HR Complaint on April 7, 2004. (Id. ¶ 118.)
[10] While Plaintiff contends that "Plaintiff clearly alleged that Schmidt had retaliated against her *based on her prior complaint* . . ." (Pl.'s Rule 56.1 Stmt. ¶ 110 (emphasis added)), this is not an allegation that an adverse action was taken against Plaintiff because she is a woman of childbearing years.

Stmt. ¶¶ 160-61.)  Allen interviewed Plaintiff, Schmidt and
fifteen other Deloitte employees, and reviewed Plaintiff's 2004
HR Complaint, Schmidt's memorandum and other relevant documents
and e-mails.  (Id. ¶¶ 164-67.)  On May 19, 2004, Allen submitted
a final report (the "Allen Report") to Deloitte which concluded
that Schmidt's comments "that could be perceived as indicating
bias in favor of hiring males, . . . in context do not appear to
reflect discriminatory intent, and Ms. Schmidt's actual
practices toward female employees contradict any inference that
she has in fact deprived women of opportunities based on sex or
family status."  (J. Schmidt Aff. ¶ 23, Ex. V).  Allen further
concluded: "[t]here is no credible evidence that Ms. Schmidt has
engaged in discrimination on the grounds of sex, childbearing
status, or any other unlawful ground alluded to by Ms.
Panzarino"; "Ms. Schmidt's concerns about Ms. Panzarino's
productivity and commitment preceded Ms. Panzarino's April 7,
2004 complaint, and therefore could not be in retaliation for
it"; there is no evidence that Schmidt's "decision to terminate
Ms. Panzarino is causally related to her earlier complaints in
2003"; Schmidt's "concerns about Ms. Panzarino's performance and
behavior, including her lack of truthfulness, are justified by
the evidence"; and "there is little or no prospect that Ms.
Panzarino can develop a productive and trustful working
relationship within the Client Acceptance group."  (Id.)  Allen

recommended that Deloitte "follow through on the planned
termination of [Plaintiff's] employment, or at least her removal
from Ms. Schmidt's group."  (Id.)[11]

After Allen submitted her report, Barton informed Plaintiff
that Deloitte would assist her in looking for another position
within Deloitte outside of the BIS Group.  (Def's. Rule 56.1
Stmt. ¶ 174; Pl.'s Rule 56.1 Stmt. ¶ 174.)  However, after an
internal search revealed no open positions for which Plaintiff
was qualified, Barton informed Plaintiff that her employment
with Deloitte would be terminated.  (Id. ¶ 176.)

On January 18, 2005, Plaintiff filed a charge of
discrimination with the Equal Employment Opportunity Commission
("EEOC"), alleging that "Schmidt has frequently displayed her
discriminatory attitudes toward younger women of childbearing
age, like myself, particularly in the last year or so" and that
"I was fired from my position in May 2004 because I complained
of unlawful sex discrimination and harassment by Schmidt."
(Panzarino Dep., Ex. 61, Dec. 6, 2006).  Nowhere in the EEOC
charge did Plaintiff claim that Schmidt retaliated against her
for her February 2003 complaint to Yarnall (nor is there any

---

[11] Plaintiff argues that the Allen Report is inadmissible hearsay and further
contends that "Allen was not given Schmidt's memo setting forth the purported
justification for terminating plaintiff's employment until *after* she
interviewed plaintiff.  Allen never gave plaintiff an opportunity to explain
that Schmidt's purported justifications for firing her were false and
pretextual."  Pl.'s Rule 56.1 Stmt. ¶ 161 (emphasis in original).  The Allen
Report is described for background only and the Court does not rely on it for
the truth of the facts asserted in it.

16

reference to a 2003 complaint). (Def's. Rule 56.1 Stmt. ¶ 188; Pl.'s Rule 56.1 Stmt. ¶ 188.) On July 6, 2005, the EEOC issued a dismissal and notice of rights. (Id. ¶ 193.)

On October 3, 2005, Plaintiff commenced suit in this Court alleging that Schmidt (1) created a hostile work environment for Plaintiff on account of her sex and (2) harassed and ultimately terminated Plaintiff in retaliation for her internal complaints in violation of Title VII, NYHRL, and NYCHRL. Defendant now moves for summary judgment.

## LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure provides that a court shall grant a motion for summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish her right to judgment as a matter of law." Rodriguez v. City of New York, 72 F.3d 1051, 1060-61 (2d Cir. 1995). The substantive law governing the case will identify those facts that are material and "[o]nly disputes over facts that might affect the outcome of the suit under the governing

17

law will properly preclude the entry of summary judgment."
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In determining whether a genuine issue of material fact
exists, a court must resolve all ambiguities and draw all
reasonable inferences against the moving party. See Matsushita
Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587
(1986). "If, as to the issue on which summary judgment is
sought, there is any evidence in the record from any source from
which a reasonable inference could be drawn in favor of the
nonmoving party, summary judgment is improper." Chambers v. TRM
Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994).

## DISCUSSION

Plaintiff asserts that Deloitte allowed Schmidt to (1)
create a hostile work environment for Plaintiff on account of
her sex and (2) harass and ultimately terminate Plaintiff in
retaliation for her internal complaints, in violation of Title
VII, NYHRL, and NYCHRL.

### 1. Hostile Work Environment

Plaintiff alleges that Schmidt "made numerous comments
complaining that women of childbearing age, like plaintiff, were
unreliable. On several occasions, Schmidt said that she needed
to populate the Business Intelligence Group with more males
because too many females were going on maternity leave [and

18

Schmidt] complained that everyone in the group was getting 'knocked up' and that one worker, who was due to give birth shortly, was 'about to pop.'" (Compl. ¶ 11.) Plaintiff further claims that "[a]s a woman of childbearing age plaintiff felt that Schmidt perceived her as a liability" and was "upset with Schmidt's pervasive disparaging talk about pregnancy, as well as her frequent use of vulgar sexual language." (Compl. ¶ 13.) According to Plaintiff, when Schmidt learned that Plaintiff had shared her concerns about Schmidt's behavior in 2003, Schmidt "began to harass plaintiff" by "requir[ing] plaintiff to keep records that were not required of other workers and shift[ing] managerial assignments away from plaintiff." (Compl. ¶ 14.) Plaintiff alleges that Defendant thereby allowed Schmidt "to harass plaintiff on account of her sex." (Compl. ¶ 22.)

Defendant responds that Plaintiff's claim is time barred because all of the incidents of alleged harassment occurred prior to March 25, 2004 (300 days after the alleged unlawful unemployment practice); that the alleged harassment was not sufficiently severe or pervasive, or motivated by discriminatory animus; and that Plaintiff has failed to set forth a basis for assigning liability to Deloitte. (Def. Mem. 16-24.)

To state a hostile work environment claim, a plaintiff must show that the workplace is "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe

19

or pervasive to alter the conditions of the victim's employment
and create an abusive working environment." Harris v. Forklift
Sys., 510 U.S. 17, 21 (1993) (internal quotation marks and
citations omitted). A plaintiff "must show not only that she
subjectively perceived the environment to be abusive, but also
that the environment was objectively hostile and abusive."
Demoret v. Zegarelli, 451 F.3d 140, 149 (2d Cir. 2006).
Plaintiff must also show that a "specific basis exists for
imputing the conduct that created the hostile environment to the
employer." Briones v. Runyon, 101 F.3d 287, 291 (2d Cir. 1996).

        "Generally, 'incidents must be more than episodic; they
must be sufficiently continuous and concerted in order to be
deemed pervasive.'" Id. (quoting Alfano v. Costello, 294 F.3d
365, 374 (2d Cir. 2002)). "To decide whether the threshold has
been reached, courts examine the case-specific circumstances in
their totality and evaluate the severity, frequency, and degree
of the abuse." Alfano, 294 F.3d at 374. In addition, courts
must also "consider the extent to which the conduct occurred
because of plaintiff['s] sex." Demoret, 451 F.3d at 149-50.
"Where reasonable jurors could disagree as to whether alleged
incidents of . . . insensitivity or harassment would have
adversely altered the working conditions of a reasonable
employee, the issue of whether a hostile work environment

existed may not properly be decided as a matter of law."

Patterson v. Oneida, 375 F.3d 206, 227 (2d Cir. 2004).[12]

In this case, the conduct Plaintiff alleges is insufficient as a matter of law to meet the threshold level of severity or pervasiveness that is required for a hostile work environment claim. Schmidt's comments were infrequent--Plaintiff claims (1) that Schmidt made only eight comments relating to pregnant women between her February 6, 2003 meeting with Yarnall and early March 2004 (Pl. Mem. 17.), and (2) that she heard Schmidt use curse words such as "[f]uck, fucking assholes, dicks" approximately once a month, and that these curses were never directed at any member of the BIS Group, (Def's. Rule 56.1 Stmt. ¶¶ 203-05; Pl.'s Rule 56.1 Stmt. ¶¶ 203-05.)  Moreover, these comments were not sufficiently severe to amount to materially adverse changes in the terms and conditions of Plaintiff's employment.  They were not physically threatening or directed at BIS Group employees, and the majority were heard second- or third-hand.  See Benette v. Cinemark U.S.A., Inc., 295 F. Supp. 2d 243, 251 (W.D.N.Y. 2003) ("[M]ost of the incidents were not directed at Benette herself or they did not happen in her

---

[12] "We have repeatedly noted that claims brought under New York State's Human Rights Law are analytically identical to claims brought under Title VII." Torres v. Pisano, 116 F.3d 625, 629 n.1 (2d Cir. 1997).

21

presence" but rather "were heard 'second-hand' through other employees.").[13]

In addition, a reasonable woman of childbearing years would not have taken Schmidt's comments seriously based on the demographics of the BIS Group and Schmidt's hiring practices. From December 2001 until April 2004, of the thirteen employees (associate level or above) Schmidt hired into the BIS Group to work on client acceptance work, eleven were women. (Def's. Rule 56.1 Stmt. ¶ 150; Pl.'s Rule 56.1 Stmt. ¶ 150.) At the time of Plaintiff's termination from the BIS Group, sixteen of nineteen associates and managers (excluding Schmidt) were female. (Id.) In addition, Plaintiff testified that she believed that all but one of the sixteen women were of childbearing years. (Id. ¶ 151.) See Benette, 295 F. Supp. 2d at 247 ("[W]hen the Court views [the manager's] conduct in the context of the overall work environment that existed at Cinemark at the relevant time, there is little evidence of a gender-based or sexually-charged hostile work environment.").

---

[13] Plaintiff attempts to bolster her hostile work environment claim by arguing that the Court should also consider the allegations that Schmidt shunned Plaintiff, treated her "as *persona non grata*," deferred to Lange on client acceptance tasks, scrutinized Plaintiff's work and attempted to "pile extra work on" Plaintiff. (Pl. Mem. 17-18). However, to set forth a sex-based hostile work environment claim under Title VII, a plaintiff must demonstrate that the conduct occurred because of her sex, Demoret, 451 F.3d at 149-50, and Plaintiff has never contended, let alone established, that these alleged instances of harassment were related to her sex or childbearing status. Instead, Plaintiff argues that these actions were in retaliation for her 2003 conversation with Yarnall or in anticipation of her 2004 HR Complaint. (Pl. Mem. 4-5, 8-9.)

Finally, Schmidt's conduct did not alter the conditions of Plaintiff's employment in the BIS Group because, according to Plaintiff, she was able to perform her job well despite Schmidt's alleged harassment.   (Def's. Rule 56.1 Stmt. ¶¶ 204-05; Pl.'s Rule 56.1 Stmt. ¶¶ 204-05.)   It is therefore undisputed that Schmidt's behavior did not tangibly impact her "ability to function in the workplace." Murray v. Visiting Nurse Servs. of N.Y., 528 F. Supp. 2d 257, 278 (S.D.N.Y. 2007). "The fact that plaintiff concedes that the [alleged harassing comments at issue] had no effect on [her] ability to perform the functions of [her] job . . . weighs in favor of granting summary judgment to defendant." Id.; see also Blackmon v. UNITEA, 03 Civ. 9214, 2005 WL 2038482, *14 (S.D.N.Y. 2005) ("Blackmon's hostile work environment claim must fail because her declaration points to no resulting disadvantage or adverse effect on her job performance caused by the incidents she describes." (internal quotation marks omitted)).

For these reasons, Plaintiff has failed to produce sufficient evidence that the workplace environment was permeated with such discriminatory intimidation, ridicule, and insult based on her sex that a reasonable person would find that the terms and conditions of employment were altered.   Accordingly, Plaintiff's hostile work environment claim under Title VII and NYHRL is DISMISSED.

The Court construes Plaintiff's NYCHRL claim independently from Plaintiff's state and federal claims because the NYCHRL "explicitly requires an independent liberal construction analysis in all circumstances, even where State and federal civil rights laws have comparable language. The independent analysis must be targeted to understanding and fulfilling . . . the City HRL's 'uniquely broad and remedial' purposes, which go beyond those of counterpart State or federal civil rights laws." Williams v. New York City Housing Auth., 872 N.Y.S.2d 27, 31 (N.Y. App. Div. 2009). Thus, less egregious conduct than that required under Title VII may support a hostile work environment claim under the NYCHRL. The City law does not impose "an overly restrictive 'severe or pervasive' bar," but defendants can nevertheless "still avoid liability if they prove that the conduct complained of consists of nothing more than what a reasonable victim of discrimination would consider 'petty slights and trivial inconveniences.'" Id. at 79-80.

Having reviewed the record separately with respect to Plaintiff's municipal claim while keeping in mind the New York City law's "uniquely broad and remedial" purposes, the Court concludes that Plaintiff has failed to demonstrate any genuine issue of material fact as to whether Defendant allowed Schmidt to create a hostile work environment. To the extent that the NYCHRL is more liberal than its state or federal counterparts,

Plaintiff has still failed to frame any genuine issue of fact as
to a hostile work environment under the NYCHRL; the conduct
alleged is far from a borderline Title VII violation.  See,
e.g., Williams, 872 N.Y.S.2d at 41 ("[S]ummary judgment will
still be available where [employers] can prove that the alleged
discriminatory conduct in question does not represent a
'borderline' situation . . . .").  Accordingly, Plaintiff's
hostile work environment claim under the NYCHRL is DISMISSED.

### 2. Retaliation

Plaintiff alleges that employees of Defendant harassed and
ultimately terminated her employment in retaliation for her
internal complaints in violation of Title VII, NYHRL and NYCHRL.

In order to make out a prima facie case of unlawful
retaliation under Title VII, a plaintiff must adduce sufficient
evidence to permit a trier of fact to find that: (1) the
plaintiff engaged in a protected activity; (2) the employer knew
of this activity; (3) the employer took adverse action against
the plaintiff; and (4) a causal connection existed between the
protected activity and the adverse action.  See Kessler v.
Westchester County Dep't of Soc. Servs., 461 F.3d 199, 205-06
(2d Cir. 2006).  Once the plaintiff establishes a prima facie
case of retaliation, the burden shifts to the employer to
establish a legitimate, non-discriminatory reason for the

action.  See Cosgrove v. Sears, Roebuck & Co., 9 F.3d 1033, 1039

(2d Cir. 1993).  If the employer meets its burden, the burden

shifts back to the plaintiff to show that "there is sufficient

potential proof for a reasonable jury to find the proffered

legitimate reason merely a pretext for impermissible

retaliation."  Richardson, 180 F.3d at 443 (citing Gallagher v.

Delaney, 139 F.3d 338, 348 (2d Cir.1998)).

Plaintiff's retaliation claim focuses on two events.

First, Plaintiff contends that after she complained about

Schmidt's conduct to Yarnall in February 2003, Schmidt "began to

harass plaintiff" by requiring her to keep records that were not

required of other workers and shifting managerial assignments

away from Plaintiff (the "2003 Retaliation Claim").  (Compl. ¶

14.)  Second, Plaintiff claims that Schmidt learned of

Plaintiff's intention to file her complaint before she submitted

it on April 7, 2004 and Schmidt began to harass her in

anticipation of it, and that Plaintiff was ultimately terminated

from her employment in retaliation for filing the 2004 HR

Complaint (the "2004 Retaliation Claim").  (Compl. ¶ 22.)

Defendant counters that because no facts about Plaintiff's

2003 conversation with Yarnall appear in the EEOC charge or the

Complaint, Plaintiff failed to exhaust administrative remedies

and failed to satisfy the pleading requirements of Federal Rule

of Civil Procedure 8.  (Def. Mem. 12-15.)  Furthermore,

Defendant argues, Plaintiff's 2003 conversation with Yarnall was not a complaint of unlawful discrimination. (Def. Mem. 12-15.) As for the 2004 Retaliation Claim, Defendant asserts: (1) that Plaintiff has failed to adduce any evidence that Schmidt knew Plaintiff would be filing a complaint, and so Schmidt could not have harassed her in anticipation of it; and (2) the decision to terminate Plaintiff's employment was made prior to and independent of Plaintiff's 2004 HR Complaint. (Def. Mem. 4-6, 12.) Finally, Defendant argues that it had legitimate, non-discriminatory reasons to terminate Plaintiff's employment. (Def. Mem. 6-11.)

As for the 2003 Retaliation Claim, the Court agrees with Defendant that Plaintiff's 2003 conversation with Yarnall was not a complaint of unlawful discrimination and was therefore not a protected activity.[14] "Title VII provides that '[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . *because [the employee] has opposed any practice* made an unlawful employment practice by [Title VII].'" Marks v. Nat'l Communications Ass'n, Inc., 72 F. Supp. 2d 322, 336 (S.D.N.Y. 1999) (quoting 42 U.S.C. § 2000e-3(a)) (emphasis added). Plaintiff "must show that she had a good faith, reasonable belief that the underlying challenged

---

[14] Plaintiff's Complaint makes no reference to the 2003 conversation with Yarnall. Nor does it refer to any allegedly retaliatory acts by Defendant stemming from that conversation.

actions of the employer violated the law." Id. (internal quotation marks omitted). "The conduct complained of need not necessarily be illegal, so long as the employee reasonably believed at the time of the complaint that a violation of the anti-discrimination laws had occurred." Id. Importantly, "the employer had to have been aware of the complaint *and must have understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by Title VII.*" Id. (citing Galdieri-Ambrosini v. Nat'l Realty & Devel. Corp., 136 F.3d 276, 292 (2d Cir. 1998)) (emphasis added).

It is undisputed that Plaintiff's February 2003 complaint to Yarnall included no allegations of gender discrimination. (Def's. Rule 56.1 Stmt. ¶ 43; Pl.'s Rule 56.1 Stmt. ¶ 43.) It is also undisputed that Plaintiff did not complain to Yarnall that she thought Schmidt's conduct violated the anti-discrimination laws in general. (Id.) Plaintiff's only argument in support of the notion that her 2003 complaint was a form of opposition to a practice that Title VII forbids is that, among the host of issues Plaintiff raised, she told Yarnall that Schmidt asked Thompson-Tucker to work on an engagement with an African-American prospective client because Thompson-Tucker is African-American. (Pl. Mem. 4-5.)

Plaintiff testified that she told Yarnall that many employees were "taken aback by this" request because it contradicted the message of an employee ethics seminar "on behavior with different races and religions and how to handle things." (Panzarino Dep. 498:1-13, Dec. 6, 2006.)  Plaintiff did not tell Yarnall that she thought the practice was discriminatory towards Thompson-Tucker or herself (or towards any other BIS Group employee).  Moreover, Plaintiff never stated that she believed Schmidt's actions were based on race (or gender).  Therefore, "there was nothing in her protests that could reasonably have led [Yarnall] to understand that that was the nature of her objections." Galdieri-Ambrosini, 136 F.3d at 292.  Plaintiff's statement that employees felt Schmidt's communication with Thompson-Tucker contradicted the principles of the ethics training session could not have alerted Yarnall "that the plaintiff's opposition was directed at conduct prohibited by Title VII." Marks, 72 F. Supp. 2d at 336.  As such, Plaintiff has failed to adduce sufficient evidence to permit a trier of fact to find that Plaintiff engaged in a protected activity. See Galdieri-Ambrosini, 136 F.3d at 292 (holding that plaintiff's complaints "in no way intimated that she believed [her manager's] conduct to be influenced by her gender, and hence there was no evidence to support a finding

that [defendant] discharged her in retaliation for opposing Title VII-prohibited discrimination").

The Court therefore turns to Plaintiff's 2004 Retaliation Claim. Plaintiff asserts: (1) that Schmidt learned of Plaintiff's intention to file the 2004 HR Complaint before she submitted it on April 7, 2004 and began to harass her in anticipation of it; and (2) that Plaintiff was ultimately terminated from her employment in retaliation for filing the 2004 HR Complaint on April 7, 2004. (Compl. ¶ 22.) As discussed, a plaintiff must adduce sufficient evidence to permit a trier of fact to find that a causal connection existed between the protected activity and the adverse action. See Kessler v. Westchester County Dep't of Soc. Servs., 461 F.3d 199, 205-06 (2d Cir. 2006). Therefore, plaintiff fails to establish the causation element where an employer can demonstrate that it initiated the adverse action in question prior to the plaintiff engaging in the protected activity. See Bryant v. Begin Manage Program, 281 F. Supp. 2d 561, 573 (E.D.N.Y. 2003) (holding that plaintiff failed to make out a *prima facie* case of retaliation because defendant sent an e-mail recommending the plaintiff's termination before plaintiff complained about the alleged discrimination).

It is undisputed that Plaintiff submitted her 2004 HR Complaint on April 7, 2004 at 9:26 A.M., five minutes after

30

Schmidt e-mailed Harmon, Ginsburg and Yarnall a copy of her

memorandum recommending Plaintiff's termination. (Def's. Rule

56.1 Stmt. ¶¶ 100, 107; Pl.'s Rule 56.1 Stmt. ¶¶ 100, 107.) It

is also undisputed that on March 25, 2004, Schmidt began

drafting her memorandum, and that on April 1, 2004, Schmidt

informed George Harmon that she intended to terminate

Plaintiff's employment based on the results of her

investigation. (Id. ¶¶ 90, 955.) This undisputed chronology

indicates that Schmidt decided to terminate Plaintiff's

employment before Plaintiff submitted her 2004 HR Complaint.

Plaintiff responds that Schmidt was aware of Plaintiff's

intention to file the 2004 HR Complaint before it was actually

submitted to Deloitte. (See Def. Mem. 10 ("[T]here is ample

circumstantial evidence that Schmidt knew or suspected that Ms.

Panzarino was preparing to complain about her misconduct a

second time . . . .").) However, Plaintiff admits that she has

no direct evidence that Schmidt was aware that Plaintiff was

preparing the 2004 HR Complaint when Schmidt recommended

Plaintiff's termination. (Def's. Rule 56.1 Stmt. ¶ 186; Pl.'s

Rule 56.1 Stmt. ¶ 186.). And, Plaintiff's "ample circumstantial

evidence" amounts to speculation. Plaintiff asserts that "[t]he

fact that plaintiff had complained about Schmidt's improper

conduct previously, discussed openly with several co-workers

that she was about to do so again, the escalating harassment by

Schmidt and her expedited attempt to fire plaintiff that
immediately ensued, and the fact that someone was rifling
through plaintiff's desk while she was away on vacation . . .
all strongly support the inference that Schmidt, a lawyer,
contemplated the likelihood that plaintiff was in the process of
complaining formally about Schmidt's misconduct." (Pl.'s Rule
56.1 Stmt. ¶ 186.)

A party responding to a motion for summary judgment
supported by affidavits must present specific evidence in
support of his contention that there is a genuine dispute as to
a material fact in the case. See St. Pierre v. Dyer, 208 F.3d
394, 404 (2d Cir. 2000). Conclusory statements, mere
conjecture, hearsay or speculation by the party resisting
summary judgment cannot defeat the motion. Bickerstaff v.
Vassar College, 196 F.3d 435, 452 (2d Cir. 1999). Here,
Plaintiff fails to present any specific evidence tending to show
that Schmidt was aware of the pending 2004 HR Complaint before
she recommended Plaintiff's termination.

Plaintiff asserts that she shared her intention to submit a
formal complaint about Schmidt with Linda Justice, Christopher
Procopis and Jeannie Rujikarn. (Panzarino Aff. ¶ 38.) Yet all
three co-workers testified that they did not tell Schmidt about
Plaintiff's plans. (L. Justice Dep. 175:3-5, Sept. 25, 2007; J.
Rujikarn Dep. 97:5-6, Jan. 18, 2007; Procopis Dep. 43.)

32

Moreover, Schmidt expressly denies that she was aware that Plaintiff planned to file the 2004 HR Complaint prior to its submission on April 7, 2004. (Schmidt Dep. 417:20-25, Oct. 11, 2007.)

Plaintiff contends that "Schmidt (or her good friend, Lisa Dane) spoke to co-worker Christopher Procopis" and that either Schmidt or Dane "said she felt something was up with Ms. Panzarino." (Pl. Mem. 9). However, Procopis testified that he did not recall who asked him this question nor when it was asked. (Procopis Dep. 128-31.) And although Plaintiff speculates that co-worker Jessica Raskin told Schmidt that something was "brewing" or "Pam was brewing" something--based solely on words found on Allen's interview notepads (see Pl.'s Rule 56.1 Stmt. ¶ 107; Rosen Affirm. ¶ 14, Ex. 13)--Raskin testified that: (1) she did not think that she told Allen that she said this; and (2) her conversation with Allen had been about Plaintiff's frequent absences from the office, not the preparation of Plaintiff's complaint. (Raskin Dep. 59:5-19, Sept. 20, 2007).

Plaintiff thus fails to identify any specific evidence that indicates Schmidt contemplated the likelihood that Plaintiff was preparing the 2004 HR Complaint. Therefore, Plaintiff has failed to adduce sufficient evidence to permit a trier of fact to find that Schmidt knew Plaintiff was engaged in a protected

activity and took an adverse action against Plaintiff because of it.  Accordingly, Plaintiff's retaliation claim under Title VII and NYHRL is DISMISSED.

As discussed earlier, the NYCHRL requires an independent and liberal construction targeted to fulfilling the NYCHRL's "uniquely broad and remedial."  Williams v. New York City Housing Auth., 872 N.Y.S.2d 27, 31 (N.Y. App. Div. 2009). Therefore, the Court construes the NYCHRL retaliation claim independently from Plaintiff's state and federal claims.  Having reviewed the record separately with respect to Plaintiff's municipal claim while keeping in mind the New York City law's "uniquely broad and remedial" purposes, the Court concludes that Plaintiff has failed to demonstrate any genuine issue of material fact as to whether Defendant retaliated against Plaintiff for engaging in a protected activity.  As discussed, Plaintiff's 2003 conversation with Yarnall was not a protected activity.  Furthermore, there is no evidence that Schmidt knew Plaintiff was preparing her 2004 HR Complaint and took an adverse action against Plaintiff because of it.  See, e.g., id. at 41.  Plaintiff has failed to frame any genuine issue of fact as to retaliation, and therefore Plaintiff's retaliation claim under the NYCHRL is DISMISSED.

**CONCLUSION**

34

For the reasons set forth above, Defendant's Motion for Summary Judgment is GRANTED.  Because no further issues remain to be decided, the Clerk of the Court is directed to close the case.

**SO ORDERED:**

Barbara S. Jones
**UNITED STATES DISTRICT JUDGE**

Dated:     New York, New York
           October 29, 2009